# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

STATE OF TEXAS,       §
      *Plaintiff*,       §
      §
v.       §
      §
JOSEPH R. BIDEN in his official       §
capacity as President of the United       §       CIVIL ACTION NO. 3:21-CV-309
States; UNITED STATES OFFICE OF       §
PERSONNEL MANAGEMENT;       §
KIRAN AHUJA, in her official capacity       §
as Director of the Office of Personnel       §
Management and as co-chair of the Safer       §
Federal Workforce Task Force;       §
GENERAL SERVICES       §
ADMINISTRATION; ROBIN       §
CARNAHAN, in her official capacity as       §
Administrator of the General Services       §
Administration and as co-chair of the       §
Safer Federal Workforce Task Force;       §
OFFICE OF MANAGEMENT AND       §
BUDGET; SHALANDA YOUNG, in her       §
official capacity as Acting Director of the       §
Office of Management and Budget and as       §
a co-chair of the Safer Federal Workforce       §
Task Force; SAFER FEDERAL       §
WORKFORCE TASK FORCE;       §
JEFFREY ZIENTS, in his official       §
capacity as co-chair of the Safer Federal       §
Workforce Task force and COVID-19       §
Response Coordinator; NATIONAL       §
AERONAUTICS AND SPACE       §
ADMINISTRATION; BILL NELSON,       §
in his official capacity as Administrator       §
of the National Aeronautics and Space       §
Administration; UNITED STATES       §
DEPARTMENT OF AGRICULTURE;       §
TOM VILSACK, in his official capacity       §
as Secretary of the United States       §
Department of Agriculture; FEDERAL       §

**ACQUISITIONS REGULATION**    §
**COUNCIL; LLOYD J. AUSTIN, III, in**    §
**his official capacity as the Secretary of**    §
**the Department of Defense**    §
    *Defendants.*    §
    §
    §
    §

---

## STATE OF TEXAS'S ORIGINAL COMPLAINT

---

### I.    INTRODUCTION

1.    Countless Texans and other Americans are being forced to choose between their livelihoods and their fundamental constitutional rights. The State of Texas and its officials have sought to protect individual rights while also encouraging and promoting effective public health techniques to combat the spread of COVID-19. The federal government, however, has launched a coordinated effort to decide for itself whether and when Americans must receive the vaccine, regardless of individual preference, healthcare needs, or religious beliefs.

2.    Our Constitution provides for a federal government of limited powers, and it does not and has never had a general police power that would give it the right to dictate any and every facet of its citizens' lives. But Defendants have no regard for the limits that the Constitution and federal statutes impose upon them. Defendants' actions are nothing short of a dramatic infringement upon individual liberties, principles of federalism and separation of powers, and the rule of law.

3.    Even worse, the federal government's cowardice has led it to have federal contractors do their dirty work. Rather than impose a vaccine mandate directly, Defendants are coercing federal contractors into demanding that the millions of Americans they employ get vaccinated or lose their

jobs. Defendants also require contractors to dictate the lives of not only those performing work connected to federal contracts, but also those employees who may not perform any federal work at all. Simply due to the misfortune of working for a company that may have a federal contract, an American may be forced to receive a vaccine they do not want or else lose their job.

4.    The federal government's overreach must come to an end. Defendants are using subterfuge to accomplish what they cannot achieve directly—universal compliance with their vaccine mandates, regardless of individual preferences, healthcare needs, or religious beliefs. And Defendants effectively claim for themselves a general police power to control American life, infringing on states' sovereignty and usurping the powers reserved to the states under the Constitution.

5.    President Biden himself has expressed little tolerance for those who do not share his views, as he put on public display when he announced that his "patience was wearing thin"[1] with Americans who choose not to receive the COVID-19 vaccine. The President has further singled out Texas as an enemy because of its stance in favor of individual liberty. Speaking about Texas Governor Greg Abbott, President Biden threatened that "[i]f they'll not help—if these governors won't help us beat the pandemic, I'll use my power as President to get them out of the way."[2] And yet, then-President-Elect Biden previously vowed not to demand any mandatory vaccinations.[3]

---

[1] Joseph Biden, Remarks by President Biden on Fighting the Covid-19 Pandemic (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/ (last visited Oct. 27, 2021).
[2] *Id.*
[3] Jacob Jarvis, "Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020?," *Newsweek* (Sept. 10, 2021), https://www.newsweek.com/fact-check-joe-biden-no-vaccines-mandatory-december-2020-1627774 (last visited Oct. 27, 2021).

6.      Through a conflicting, vague, and confusing web of executive orders, task force directives, and contract requirements, Defendants have made it obvious that they will accept nothing less than complete obedience and compliance with their vision for how to fight COVID-19. Defendants apparently have no concern for the disastrous potential effects of Defendants' coercive tactics on the economy or the erosion of Americans' liberties. Even one American being forced by their government to receive a vaccine that they do not want out of fear of losing their job is an irreparable injury and a stain on Defendants' records. But the broader implications of these unlawful vaccine mandates, if they are not stopped, portend a dark future for the economy and the American way of life.

7.      The State of Texas respectfully requests that the Court put an end to these unlawful and coercive tactics and stop this pernicious erosion of fundamental rights.

## II.      PARTIES

8.      Plaintiff State of Texas is a sovereign State of the United States of America and has the authority and responsibility to protect its sovereign interests, its public fisc, and the health, safety, and individual liberties of its citizens.

9.      Defendant Joseph R. Biden is the President of the United States. President Biden is sued in his official capacity.

10.     Defendant United States Office of Personnel Management ("OPM") is an independent federal agency.

11.     Defendant Kiran Ahuja is director of OPM and co-chair of the Safer Federal Workforce Task Force. She is sued in her official capacity.

12.     Defendant General Services Administration ("GSA") is an independent federal agency.

13.     Defendant Robin Carnahan is administrator of GSA and co-chair of the Safer Federal Workforce Task Force as well as a member of the Federal Acquisitions Regulation Council ("FAR Council"). She is sued in her official capacity.

14.     Defendant Office of Management and Budget ("OMB") is an office within the Executive Office of the President of the United States.

15.     Defendant Shalanda Young is Acting Director of the OMB and is a member of the Safer Federal Workforce Task Force. She is sued in her official capacity.

16.     Defendant Safer Federal Workforce Task Force was established January 20, 2021, by Executive Order 13991.

17.     Defendant Jeffrey Zients is co-chair of the Safer Federal Workforce Task Force and is President Biden's COVID-19 Response Coordinator. He is sued in his official capacity.

18.     Defendant National Aeronautics and Space Administration ("NASA") is an independent federal agency.

19.     Defendant Bill Nelson is the Administrator of NASA and a member of the FAR Council. He is sued in his official capacity.

20.     Defendant the United States Department of Agriculture ("USDA") is an independent federal agency.

21.     Defendant Tom Vilsack is the Secretary of the USDA. He is sued in his official capacity.

22.     Defendant Federal Acquisitions Regulation Council is responsible for managing, coordinating, controlling, and monitoring the maintenance of, issuance of, and changes in the FAR.

23.     Defendant Lloyd J. Austin, III., is the Secretary of the Department of Defense and a member of the FAR Council. He is sued in his official capacity.

### III.    JURISDICTION AND VENUE

24.    This Court has jurisdiction under 5 U.S.C. §§ 702 and 703 and 28 U.S.C. §§ 1331, 1346, and 1361, under the United States Constitution, and pursuant to the Court's equitable powers.

25.    The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706 and 28 U.S.C. §§ 1361, 2201, and 2202.

26.    Venue is proper within this District pursuant to 28 U.S.C. § 1391(e) because (1) Plaintiff is the State of Texas and no real property is involved and (2) "a substantial part of the events or omissions giving rise to the claim occurred" in this District.

### IV.    LEGAL BACKGROUND

27.    Federal contracting and procurement is an arcane area of law that is difficult to navigate, and Defendants have weaponized that complexity. In attempting to impose a vaccination mandate on their contractors, Defendants have run afoul of federal law in many respects, as described below. The interlocking federal statutes and requirements at issue lead to one inescapable conclusion: the federal executive branch cannot achieve its unlawful policy outcomes through clever manipulation of federal contracts and contractors.

### A.    The Procurement Act.

28.    The purpose of the Federal Property and Administrative Services Act ("Procurement Act"), adopted by Congress in 1949, "is to provide the Federal Government with an economical and efficient system for" procurement. 40 U.S.C. § 101. "The text of the Procurement Act and its legislative history indicate that Congress was troubled by the absence of central management that could coordinate the entire government's procurement activities in an efficient and

economical manner." *Chamber of Comm. of U.S. v. Reich*, 74 F.3d 1322, 1333 (D.C. Cir. 1996) (citation omitted).

29.     The legislative history of the Procurement Act is replete with references to the need for an "efficient, businesslike system of property management." *Id.* at 1333 (citation omitted). The Procurement Act authorizes the President to "prescribe policies and directives that the President considers necessary to carry out" the Act but requires that such policies prescribed by the President "be consistent with" the Act. 40 U.S.C. § 121(a).

30.     Such policies, and regulations established pursuant to them, are not valid unless there is a "nexus between the regulation and some delegation of the requisite legislative authority by Congress," and "the reviewing court [must] reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Chrysler Corp. v. Brown*, 441 U.S. 281, 304, 308 (1979). Congress did not authorize the President to issue orders with the force or effect of law, as it authorized the GSA Administrator to do. *Compare* 40 U.S.C. § 121(a) ("prescribe polices and directives"), *with id.* § 121(c) ("prescribe regulations"); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.").

31.     No nexus exists when the President prescribes policies that are "too attenuated to allow a reviewing court to find the requisite connection between procurement costs and social objectives." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981). Nor does a nexus exist when such policies are imposed on subcontractors, who have "no direct connection to federal procurement" and do "not lie 'reasonably within the contemplation of' the Procurement Act." *Id.* at 171–72.

32.     The Procurement Act does not give the President "unlimited authority to make decisions he believes will likely result in savings to the government . . . the procurement power must be exercised consistently with the structure and purposes of the statute that delegates that power." *Reich*, 74 F.3d 1322 at 1330–31.

**B.      The Office of Federal Procurement Policy Act.**

33.     The Office of Federal Procurement Policy Act ("Procurement Policy Act") requires that

> a procurement policy, regulation, procedure, or form (including an amendment or modification thereto) may not take effect until 60 days after it is published for public comment in the Federal Register . . . if it—(A) relates to the expenditure of appropriate funds; and (B)(i) has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form; or (ii) has a significant cost or administrative impact on contractors or offerors.

41 U.S.C. § 1707(a); *see also* 41 U.S.C. § 401 *et seq.*

34.     "[T]he language of [§ 1707] is broad" and applies not only to FAR but to all procurement policies, regulations, procedures, and forms "'down to the lowest level.'" *Munitions Carriers Conf., Inc. v. United States*, 932 F. Supp. 334, 338 (D.D.C. 1996), *rev'd on other grounds*, 147 F.3d 1027 (D.C. Cir. 1998).

35.     The notice requirement may only be "waived by the officer authorized to issue a procurement policy, regulation, procedure, or form if urgent and compelling circumstances make compliance with the requirements impracticable." 41 U.S.C. § 1707(d). And even when Section 1707 has been waived, the Procurement Policy Act implementing regulations require that revisions subject to a waiver "shall be issued on a temporary basis and shall provide for at least a 30-day public comment period." 48 C.F.R. § 1.501–3(b).

**C.      The Federal Acquisition Regulation.**

36.      As the problems with continuity and coordination amongst the many federal agencies proved problematic, in 1979 Congress directed the Office of Federal Procurement Policy ("OFPP"), an office within the OMB, to "issue policy directives . . . for the purpose of promoting the development and implementation of [a] uniform procurement system," with the concurrence of the OMB Director.[4] Under the policy directive of the Administrator of the OFPP, in 1983 the Department of Defense, GSA, and NASA jointly promulgated the first version of the Federal Acquisition Regulation ("FAR").[5]

37.      In 1988, Congress established the FAR Council "to assist in the direction and coordination of [g]overnment-wide procurement policy and [g]overnment-wide procurement regulatory activities in the [f]ederal government." 41 U.S.C. § 1302(a). The FAR Council consists of the OFPP Administrator, the Secretary of Defense, and the Administrator of NASA, and the GSA Administrator. 41 U.S.C. § 1302(b). Subject to limited exceptions, the FAR Council has the exclusive authority to issue "a single [g]overnment-wide procurement regulation." 41 U.S.C. § 1302(a)(1); *see also* 41 U.S.C. § 1303. Importantly, no other agency is authorized to issue government-wide procurement regulations. 41 U.S.C. § 1302(a)(2).

38.      Within the delegated authority relating to procurement policies, Congress requires that "procurement policy, regulation, procedure, or form"—whether issued government-wide by the FAR Council or by one agency for that agency—be subject to notice and comment. 41 U.S.C.

---

[4] *See* Office of Federal Procurement Policy Amendments of 1979, Pub. L. No. 96-83, § 4(e), 93 Stat. 650; *see also* Kate M. Manual et al., Cong. Rsch. Serv., R4286, The Federal Acquisition Regulation (FAR): Answers to Frequently Asked Questions 10 (2015), https://sgp.fas.org/crs/misc/R42826.pdf (last visited Oct. 28, 2021).
[5] 48 Fed. Reg. 42, 102 (Sept. 19, 1983).

§ 1707(a)-(b). The notice and comment requirement may be waived only if "urgent and compelling circumstances make compliance with the requirements impracticable." 41 U.S.C. § 1707(d).

**D.    The Major Questions Doctrine.**

39.    Courts will not assume that Congress has assigned to Executive Branch questions of "deep economic and political significance" unless Congress has done so expressly. *See King v. Burwell*, 576 U.S. 473, 486 (2015); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). By Defendants' own estimates, the Contractor Mandate[6] will affect "millions" of individuals. On average, federal government spending accounts for 20% to 25% of the U.S. economy and has been even higher during the COVID-19 pandemic. This year alone, the U.S. Small Business Administration announced that it awarded $145.7 billion in federal contract dollars to small businesses.[7] Accordingly, Defendants' vaccine mandates will have deep economic and political significance on a substantial portion of the economy.

40.    Defendants' attempt to use the Procurement Act as justification for the Contractor Mandate mirrors the Defendants' attempt to use the Public Health Safety Act to justify a far-reaching nationwide eviction moratorium. Determining that the CDC had exceeded its authority, the Supreme Court held, "We expect Congress to speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (quoting *Utility Air Regulatory Grp. v. EPA*,

---

[6] *See* Part V.B, *infra*.

[7] *Federal Government Awards Record-Breaking $145.7 Billion in Contracting to Small Businesses*, July 28, 2021, https://www.sba.gov/article/2021/jul/28/federal-government-awards-record-breaking-1457-billion-contracting-small-businesses (last visited Oct. 2, 2021).

573 U.S. 302, 324 (2014)). This is particularly true when the federal government "intrudes into an area that is the particular domain of state law." *Id.* The Supreme Court's "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *Id.* The Procurement Act contains no language authorizing the President to issue and impose mandatory nationwide public health measures.

## V.    FACTUAL BACKGROUND

41.    Against the backdrop of this legal framework, Defendants have attempted to abuse the federal contracting and procurement process to force potentially millions of Americans to receive unwanted medical treatment. These efforts are already bringing acute and irreparable harm to countless Texans, with disastrous effects looming on the horizon for the State and its citizens.

**A.    Biden Administration Response to COVID-19.**

42.    On January 20, 2021, his first day in office, President Biden issued Executive Order ("EO") 13991, 86 Fed. Reg. 7045, which established the Safer Federal Workforce Task Force ("Task Force") and charged it with "provid[ing] ongoing guidance to heads of agencies on the operation of the Federal Government, the safety of its employees, and the continuity of Government functions during the COVID-19 pandemic." 86 Fed. Reg. at 7046. The Task Force is headed by three co-chairs, including the Director of OPM (Defendant Ahuja), the Administrator of GSA (Defendant Carnahan), and the COVID-19 Response Coordinator (Defendant Zients). EO 13991 also required that the GSA "provide funding and administrative support for" the Task Force. *Id.*

43.     On September 9, 2021, President Biden announced his "new plan to require more Americans to be vaccinated" by imposing "new vaccination requirements" that "require all employers with 100 or more employees, that together employ over 80 million workers, to ensure their workforces are fully vaccinated or show a negative test at least once a week."[8] President Biden also announced plans to "require vaccinations" of "those who work in hospitals, home healthcare facilities, or other medical facilities—a total of 17 million healthcare workers."[9] He further announced he would "sign an executive order that will now require all executive branch federal employees to be vaccinated – all. And I've signed another executive order that will require federal contractors to do the same."[10] Finally, President Biden announced that he would "require all of nearly 300,000 educators in the federal paid program, Head Start program," to get vaccinated.[11] In total, President Biden's vaccine mandates affect over 80 million Americans, a quarter of the total population of the United States, and one in three adult Americans.[12]

44.     Dr. Anthony Fauci, Director of the National Institute of Allergy and Infectious Diseases under the Biden Administration, supports "many, many more [vaccine] mandates,"[13] but last year, he held an entirely different position: "You don't want to mandate and try and force anyone

---

[8] The U.S. Department of Labor Occupational Safety and Health Administration ("OSHA") sent a proposed emergency regulation to the White House for review. *OSHA Sends Employer Vaccine Rule to White House for Final Review*, https://news.bloomberglaw.com/daily-labor-report/osha-sends-employer-vaccine-rule-to-white-house-for-final-review (last visited Oct. 29, 2021). The OSHA regulation is not a party of any of the claims in this Complaint.

[9] *Supra* n.1.

[10] *Id.*

[11] *Covid-19 and the Head Start Community*, https://eclkc.ohs.acf.hhs.gov/about-us/coronavirus/vaccination-head-start-staff (last visited Oct. 29, 2021).

[12] *Supra*, n.1.

[13] *Fauci: 'Many, Many' More Vaccine Mandates Needed to End Pandemic*, https://www.webmd.com/vaccines/covid-19-vaccine/news/20210913/fauci-many-more-vaccine-mandates-needed-to-end-pandemic (last visited Oct. 29, 2021).

to take a vaccine. We've never done that." He continued, "[A vaccine mandate] would be unenforceable and inappropriate."[14]

45.     Similarly, before September 2021, Defendants' consistent position had been that the federal government lacks the authority Defendants are now claiming to possess. For example, on July 23, 2021, the White House acknowledged that imposing vaccine mandates is "not the role of the federal government; that is the role that institutions, private-sector entities, and others may take . . . . [W]e're going to continue to work in partnership to fight misinformation. And we're going to continue to advocate and work in partnership with local officials and – and trusted voices to get the word out."[15] Then President-Elect Biden made nearly identical comments in response to a question about whether COVID-19 vaccines should be made mandatory, stating: "[n]o, I don't think it should be mandatory. I wouldn't demand it to be mandatory."[16]

**B.     The Contractor Mandate.**

46.     On September 9, 2021, President Biden signed EO 14042, titled *Executive Order on Ensuring Adequate COVID Safety Protocols for Federal Contractors*, attached as Exhibit A.

---

[14] Joel Saget, *COVID-19 vaccine won't be mandatory in US, says Fauci*, Aug. 19, 2020, https://www.yahoo.com/now/covid-19-vaccine-wont-mandatory-194038185.html?guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAJT4sIDp7k-tPsJykruGU6nB9lc4OF06tgUuLj_5yfA64cOBruF5BTeM3o75aTICcCOCjinKlMgTXWx5kptjbu26VeA_XOcFLsMu7WQuJ7aLGcxG57UhmBHj6Z9SDlOwbS9i6txpMthNrALU7jblr58NVyiAZA-WXF2HZ8rfWg-9&guccounter=2 (last visited Oct. 29, 2021).
[15] Jen Psaki, White House Press Briefing (July 23, 2021), https://www.whitehouse.gov/briefing-room/press-briefings/2021/07/23/press-briefing-by-press-secretary-jen-psaki-july-23-2021/ (last visited Oct. 27, 2021)
[16] Jacob Jarvis, "Fact Check: Did Joe Biden Reject Idea of Mandatory Vaccines in December 2020?," *Newsweek* (Sept. 10, 2021), https://www.newsweek.com/fact-check-joe-biden-no-vaccines-mandatory-december-2020-1627774 (last visited Oct. 27, 2021)

47.     EO 14042 purports to "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers." Ex. A at 1. In EO 14042, President Biden claims "ensuring that Federal contractors and subcontractors are adequately protected from COVID-19 will bolster economy and efficiency in Federal procurement." *Id.*

48.     EO 14042 directs executive agencies subject to the Procurement Act to include in all federal contracts and "contract-like instruments" a clause that contractors and subcontractors will comply with all future guidance issued by the Task Force.

49.     EO 14042 requires that the Task Force establish and issue "COVID Safety Protocols" by September 24, 2021.[17] The EO did not explicitly make any provision for religious or medical exemptions to the "Safety Protocols."

50.     EO 14042 further required that the Director of OMB publish a determination in the Federal Register as to "whether such Guidance will promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors." Ex. A at 2.

51.     On September 24, 2021, the Task Force released a directive to federal agencies for implementing Defendants' vaccine mandate on contractors and subcontractors (the "Task Force Directive"), attached as Exhibit B.[18] This directive was never published to the Federal Register for public comment. Among many things, the Task Force Directive included the following:

    a.   A deadline of December 8, 2021, for "covered contractor employees" to be fully

---

[17] Exec. Order No. 14042, "Ensuring Adequate COVID Safety Protocols for Federal Contractors," 86 Fed. Reg. 50985 (Sept. 9, 2021).

[18] Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors                                    and                                    Subcontractors*, https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20 210922.pdf (last visited Oct. 29, 2021).

vaccinated.[19]

b.  A definition of the term "covered contractor employee" to "include[] employees of covered contractors who are not themselves working on or in connection with a covered contract" if they are working at the same location, thus imposing vaccine requirements on employees of contractors and subcontractors who are not even working on federal contracts.[20]

c.  A requirement that the FAR Council conduct rulemaking to amend the FAR to impose the Contractor Mandate.[21]

d.  A deadline of October 8, 2021, for the FAR Council to develop a contract clause to implement the Contractor Mandate for agencies to include in contracts. The Directive also instructs the FAR Council to "recommend that agencies exercise their authority to deviate from the FAR" and use the vaccination mandate clause in contracts even before the FAR is amended.[22]

e.  A deadline of October 15, 2021, for agencies to include that contractual clause in solicitations.[23]

f.  A deadline of November 14, 2021, after which awarded contracts must include that contractual clause. For contracts entered into between October 15, 2021, and November 14, 2021, and for which the solicitation was issued before October 15, 2021, the guidance states that agencies are encouraged to include the clause but are not required to do so.[24]

g.  A requirement that for contracts awarded "prior to October 15 and where performance is ongoing" the vaccine mandate clause "must be incorporated at the point at which an option is exercised, or an extension is made."[25]

h.  Requirements that the Contractor Mandate must apply even to persons who have already been infected with COVID-19, workplace locations that are outdoors, and contractor employees who are working remotely full time.[26]

i.  A statement asserting that the Task Force Directive supersedes legal requirements in

---

[19] *Id*. at 5.
[20] *Id*. at 3–4.
[21] *Id*. at 12.
[22] *Id*.
[23] *Id*. at 11–12.
[24] *Id*. at 12.
[25] *Id*.
[26] *Id*. at 10–11.

states or localities that prohibit vaccine mandates.[27]

52.     Under the Task Force Directive, a "covered contractor employee" required to be vaccinated is any full-time or part-time employee "working on or *in connection with* a covered contract; *or* working at a covered contractor workplace."[28] The guidance defines employees working "in connection with a covered contract" as employees "who perform duties necessary to the performance of the covered contract, but *who are not directly engaged in performing the specific work* called for by the covered contract."[29] This language suggests that an employee with even a tangential connection to a covered contract would fall under the scope of the mandate, even if that employee works in an office far from the contract work location.

53.     Moreover, because a "covered contractor workplace" includes any location controlled by a covered contractor where a covered contract employee is likely to be present, entire contractor offices could be required to be vaccinated, even if only one employee has a tangential connection to a covered contract. At the same time, a "covered contractor workplace" does not include the residence of an individual working on a covered contract, which leads to the result that an employee working remotely who works "on or in connection with" a covered contract is required to be vaccinated, although a family member in the same household who works for the same contractor (but not on a covered contract) is not. These rules and their outcomes are nonsensical and confusing. Contractors who seek to comply with their obligations are left with little choice but to

---

[27] *Id.* at 13.

[28] COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors, September 24, 2021, available at https://www.saferfederalworkforce.gov/downloads/Draft%20contractor%20guidance%20doc_20210922.pdf (emphasis added) (last visited Oct. 29, 2021).

[29] *Id.* (emphasis added).

require that their entire workforce be vaccinated.

54.     On September 28, 2021, Defendant Shalanda Young, the Acting Director of the OMB, published a notice in the Federal Register[30] in which Ms. Young made the conclusory statement that "compliance with COVID-19 related safety protocols improves economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." 86 Fed. Reg. 53691, 53692. Ms. Young provides she had "determined that compliance by Federal contractors and subcontractors with COVID-19 workplace safety protocols detailed in the [Task Force] guidance will improve economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract." 86 Fed. Reg. 53691, 53692. OMB's determination is attached as Exhibit C.

55.     Ms. Young provided no evidence or citation supporting the claims in her determination. Ms. Young's notice was not subject to public comment. Furthermore, Ms. Young's determination did not claim there were any urgent and compelling circumstances in this case, and her Federal Register notice did not include a 41 U.S.C. § 1707(d) waiver of the Procurement Policy Act requirement that a procurement policy may not take effect until 60 days after it is published for public comment in the Federal Register.

56.     In addition, neither the Task Force Directive nor Ms. Young's Notice addressed a host of critical issues that are inextricably intertwined with Defendants' alleged mission of providing adequate health safeguards during the COVID-19 pandemic. Defendants, for example, have not addressed—much less reasonably explained—why natural immunity should not be considered an

---

[30] 86 Fed. Reg. 53691, 53692 (Sept. 28, 2021).

adequate alternative to vaccination. Nor would it be possible to reasonably explain away this omission; by all indications, natural immunity confers superior resistance to COVID-19 than any of the currently available vaccines, and one in three Americans had COVID by the end of 2020. [31] Defendants also have not addressed—much less reasonably explained—why other best practices in fighting the spread of COVID-19 could not be used in lieu of vaccination mandates. Nor would it be possible to reasonably explain away this omission; for example, testing has the advantage of providing relative certainty that an individual in the workplace is not infected with COVID-19, whereas vaccination does not provide that guarantee. Defendants likewise have not addressed— much less reasonably explained—what accommodations should be in place for contractor employees regarding individual preferences, healthcare needs, or religious beliefs.

## C.   FAR Council Directive.

57.     On September 30, 2021, the FAR Council issued Class Deviation Clause 252.223–7999 (the "FAR Deviation Clause") with an accompanying memorandum providing instructions to implement EO 14042, attached hereto as Exhibit D.

58.     The FAR Council issued these instructions and Deviation Clause to all Chief Acquisition Officers, Senior Procurement Officers, the Defense Acquisition Regulations Council, and the Civilian Agency Acquisition Council. The memorandum stipulated that one of the stated purposes

---

[31] *See, e.g.*, Meredith Wadman, *Having SARS-CoV-2 once confers much greater immunity than a vaccine—but vaccination remains vital: Israelis who had an infection were more protected against the Delta coronavirus variant than those who had an already highly effective COVID-19 vaccine*, https://www.science.org/content/article/having-sars-cov-2-once-confers-much-greater-immunity-vaccine-vaccination-remains-vital (last visited Oct. 29, 2021); *One in Three Americans Already Had COVID-19 by the End of 2020*, https://www.publichealth.columbia.edu/public-health-now/news/one-three-americans-already-had-covid-19-end-2020 (last visited Oct. 29, 2021).

*State of Texas's Original Complaint*                                                                              18

of the FAR Deviation Clause and guidance, which was published the next day, was to "maximize the goal of getting more people vaccinated and decrease the spread of Covid-19."[32]

59.     The FAR Deviation Clause is to be inserted into covered contracts and subcontracts. The FAR Council also issued guidance to agencies regarding the implementation of the FAR Deviation Clause. The Deviation Clause, when inserted into covered contracts and subcontracts, imposes the Task Force's requirements and also, when inserted, imposes the requirements listed on the Task Force's Frequently Asked Questions website.

**D.     The State of Texas's Response to the COVID-19 Pandemic.**

60.     Since March 2020, Texas government officials have responded to the COVID-19 pandemic with a measured and deliberate approach specific to the needs of Texas and Texans. On March 19, 2020, Governor Abbott announced the first of many Executive Orders to control and combat the growing number of COVID-19 cases. [33] Texas has consistently sought to create a uniform response to the pandemic in accordance with the State's police power to protect public health and safety while also promoting and encouraging best practices to fight the spread of COVID-19.

61.     As was reported nationwide throughout 2020, the number of COVID-19 cases grew, waned, and then grew again as summer approached, and Americans could no longer tolerate the restrictive measures many government officials had imposed. Throughout the entirety of the

---

[32] September 30, 2021 Memorandum: Issuance of Agency Deviation to Implement Executive Order 14042, https://www.whitehouse.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf (last visited Oct. 28, 2021).

[33] The Governor's Executive Orders have the force and effect of State law and have been one of the State's primary tools in the fight against and recovery from COVID-19. *See, e.g.*, Tex. Gov't Code § 418.012.

*State of Texas's Original Complaint*                                                                    19

COVID-19 pandemic, Texas state government has exercised and sought to maintain its exclusive authority over Texas' response to and recovery from the pandemic.[34]

62.     In April 2021, Government Abbott issued Executive Order GA-39, which in part ensured that medical autonomy was up to the individual Texan by providing that no governmental entity can compel any individual to receive a COVID-19 vaccine administered under the emergency use authorization.[35] Recognizing that Federal Government overreach was impending and that the right to choose whether to take the vaccine would be stripped from all Texans in some form, Governor Abbott issued GA-40. Signed by Governor Abbott October 11, 2021, GA-40 further protects personal liberty and autonomy and makes it illegal for *any* entity in Texas to compel receipt of a COVID-19 vaccine by any individual, including an employee or a consumer, who objects to such vaccination "for any reason of personal conscience, based on a religious belief, or for medical reasons, including prior recovery from COVID-19."[36] GA-40 protects the rights of the individual Texan and prohibits any entity from compelling receipt of a COVID-19 vaccine by any individual who objects for any reason.[37]

63.     Governor Abbott and the State of Texas have made it clear to Texans: the decision whether to receive a vaccine should be free from governmental control. In response, millions of Texans have enthusiastically adopted best practices for public health and safety, including widespread

---

[34] Tex. Gov't Code § 418.002(1), (3).

[35]     GA-39 is publicly available at https://gov.texas.gov/uploads/files/press/EO-GA-39_prohibiting_vaccine_mandates_and_vaccine_passports_IMAGE_08-25-2021.pdf (last visited Oct. 29, 2021).

[36]     GA-40 is publicly available at https://gov.texas.gov/uploads/files/press/EO-GA-40_prohibiting_vaccine_mandates_legislative_action_IMAGE_10-11-2021.pdf (last visited Oct. 29, 2021).

[37] *Supra*, n.6.

uptake of the COVID-19 vaccine. So far in Texas, over 34 million doses of COVID-19 vaccines have been administered, over 61% of Texans have received at least one dose of a COVID-19 vaccine, and over 53% of the total Texan population eligible for vaccines are fully vaccinated.[38] Despite Texas's diversity and largely rural character, Texas ranks above many states in vaccination rates—all without any government vaccine mandate.[39]

### E.    The Effect of Defendants' Unlawful Vaccine Mandates on Texas.

64.     The State of Texas contracts and subcontracts with the federal government as a matter of course. In the 2020-2021 fiscal year, the State of Texas, including governmental bodies of the State, maintained a total potential value of *prime* contracts with the federal government in excess of $7.3 billion.[40] In the same 2020-2021 fiscal year, the State of Texas maintained a total potential value of *sub*-contracts with the federal government in excess of $20.3 million.[41] The State of Texas expects to continue to pursue government contracts in the future. However, if the State of Texas does not acquiesce to the federal government's coercion, the State of Texas stands to lose over $7.32 billion in future contracts.[42]

65.     Additionally, the State of Texas faces an impending labor shortage as federal labor walk-outs and strikes continue to occur as a result of the federal vaccine mandates—potentially leading to significant, concrete financial harm to the State in the form of unemployment benefits and

---

[38] Texas Coronavirus Vaccination Progress, https://usafacts.org/visualizations/covid-vaccine-tracker-states/state/texas (last visited Oct. 28, 2021).
[39] *See, e.g.*, U.S. COVID-19 vaccine tracker, Mayo Clinic, https://www.mayoclinic.org/coronavirus-covid-19/vaccine-tracker (lasted visited Oct. 29, 2021); COVID-19 Vaccinations in the United States, CDC, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-total-admin-rate-total (last visited Oct. 29, 2021).
[40] USA Spending, https://www.usaspending.gov/search (last visited Oct. 28, 2021)
[41] *Id.*
[42] *Id.*

increased Medicaid expenses. Effects on the Texas labor force since the September 9, 2021 federal vaccine mandates include:

    a. Southwest Airlines Pilot Association, representing 9,000 Southwest pilots, filed suit to block the vaccine mandate which unilaterally altered the collective bargaining agreement imposing new conditions of employment.[43] As a result of this federal overreach, one weekend in early October saw over 2,500 nationwide flights cancelled.

    b. Organizations representing nursing homes in Texas, who accept both federal Medicare and Medicaid funding, came out with justifiable concerns that "singling out nursing home staff for required vaccinations could exacerbate an already untenable workforce shortage."[44]

    c. Texas Tech University, a public University in the State of Texas, stands to lose over $7 million from federal contracts if they do not adopt the contract amendments. Texas Tech University undergraduate and graduate students will be negatively impacted by this loss of funding. Declaration of Texas Tech University Vice Chancellor and General Counsel, attached as Exhibit E.

    d. A recent study published by the Job Creator's Network, a non-partisan organization representing the nearly 85 million Americans that depend on small business, found that companies are losing over 30% of the workforce due to the vaccine mandate.[45]

    e. The Chief Executive of Raytheon Technologies, a defense-contractor with offices in Dallas, Texas recently announced they expect to lose "several thousand people" due to the vaccine mandates. Raytheon anticipates the vaccine mandate will cause further "disruption" in the current supply chain crisis.[46]

---

[43] *Sw. Pilots Ass'n v. Sw. Airlines*, Cause No. 3:21-cv-02608-M, pending in the U.S. District Court for the Northern District of Texas.

[44] Vaccine Mandate Could Make Nursing Home Staff Shortage Worse, September 10, 2021, https://www.newswest9.com/article/news/health/coronavirus/vaccine/vaccine-mandate-nursing-home-staff-shortage/513-02e9c098-14c3-4311-bfc5-e8144c8fe1b3 (last visited Oct. 28, 2021).

[45] Job Creators Network says companies losing 30% of workforce due to vaccine mandate, https://katv.com/news/nation-world/job-creators-network-says-companies-losing-30-of-workforce-due-to-vaccine-mandate (last visited Oct. 28, 2021).

[46] Raytheon warns of worker losses as companies impose vaccine mandate, https://www.reuters.com/business/healthcare-pharmaceuticals/raytheon-will-lose-several-thousand-workers-due-covid-19-vaccine-mandate-ceo-2021-10-26/ (last visited Oct. 29, 2021).

*State of Texas's Original Complaint*

    f.    Nationally, business groups representing millions of workers have warned of "mass layoffs" and "catastrophic" supply chain disruptions caused by the vaccine mandates.[47]

    g.    In Amarillo, Texas, the community has protested Defendants' vaccine mandate being enforced at a Bell Helicopter facility, where workers must be fully vaccinated before December 8 or face termination. Texans were quoted as saying that "[i]t's our choice as to what medical treatments we want to have and it's not the governments choice to push them upon us" and that "[a] lot of us here are willing to lose our jobs over this."[48]

66.    These are just a handful of examples that demonstrate the harms that Defendants' unlawful and coercive tactics are already having on the State of Texas and on its citizens, businesses, and agencies. Upon information and belief, other federal contractors within the State have been and will continue to be targeted and threatened by various federal agencies if they refuse to abide by Defendants' unilateral policy impositions.

67.    Defendants' ability to threaten contract termination for any contractor who fails to comply leaves federal contractors with no ability to stand up for themselves. In the face of Defendants' unlawful overreach, contractors face the same choice that they are forced to impose on their employees: accept the unlawful conditions imposed by Defendants or risk the federal contracts that may form the foundation of their businesses.

68.    Moreover, the threat of retribution exists for even daring to resist Defendants' cozenage and ruthless tactics, chilling contractors' ability to stand up for themselves in court. Because of the

---

[47] Business group warns of mass layoffs and 'catastrophic' supply chain disruptions from Biden vaccine mandate, https://www.cnn.com/2021/10/22/business/vaccine-supply-chain-biden/index.html (last visited Oct. 29, 2021).

[48] Taylor Mitchell, "Amarillo Bell Helicopter employees hold peaceful protest regarding COVID-19 vaccine mandate," KFDA (Oct. 20, 2021), available at https://www.newschannel10.com/2021/10/21/amarillo-bell-helicopter-employees-hold-peaceful-protest-regarding-covid-19-vaccine-mandate/ (last visited Oct. 29, 2021).

threat of retribution, it makes no economic or logical sense for a federal contractor to challenge Defendants' actions. Even if the contractor were to succeed in Court, it would *still* stand to permanently lose federal contracts and all associated sources of revenue. That is because the federal government exercises substantial discretion when it awards contracts, and any contractor that sued the administration over this politically charged issue—or any issue of political significance in the future, even under a different federal administration—would risk that discretion being used against it in future bidding for contracts. Accordingly, the State itself is also a voice for the countless Texans who will have their liberties—or their livelihoods—destroyed by Defendants' illegal actions.

## VI.  CLAIMS FOR RELIEF

### COUNT 1
### Ultra Vires Acts of the President

69.     The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

70.     The purpose of the Procurement Act is to provide the Federal Government with an "economical and efficient system" for, among other things, procuring and supplying property and nonpersonal services. 40 U.S.C. § 101. The Procurement Act permits the President to prescribe certain policies and directives within the scope of the Act. 40 U.S.C. § 121. The President's power under the Procurement Act must be exercised consistently with the structure and purposes of the statute that delegates that power—namely, efficiency and economy in procurement.

71.     Executive Orders issued pursuant to the President's authority under the Procurement Act are subject to judicial review. *Reich*, 74 F.3d at 1330. The President may only issue executive orders that have a nexus to the purposes of the Procurement Act. When the President exceeds his

authority under the Procurement Act, the President acts *ultra vires* and the Executive Order may be deemed unconstitutional.

72.     There is no articulable nexus between Executive Order 14042 or the Task Force Directive the Executive Order required and the Procurement Act's purpose of providing an "economical and efficient system" of procurement. 40 U.S.C. § 101. In fact the Contractor Mandate will have a deleterious effect on economy and efficiency by causing large-scale resignations or layoffs of unvaccinated employees of federal contractors. A mandate requiring vaccination has no direct connection to federal procurement and does not lie reasonably within the contemplation of the Procurement Act.

73.     Defendant's attempt to impose sweeping controls on one-fourth of the economy via procurement is a question of deep economic and political significance, and Congress did not intend—nor does the Procurement Act allow—the President to exercise such sweeping authority under the guise of "procurement" in the absence of clear and explicit congressional authorization. Such arrogation of power violates the Major Questions Doctrine.

74.     The President has acted *ultra vires* in issuing EO 14042 and imposing the Contractor Mandate.

**COUNT 2**
**Failure to Conduct Notice and Comment**
**Violation of the Procurement Policy Act**
**(OMB Rule and Task Force Directive)**

75.     The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

76.     Under 41 U.S.C. § 1707(a)-(b), procurement "polic[ies], regulation[s], procedure[s], or form[s]" must go through notice and comment if it "relates to the expenditure of appropriated

funds" and either "has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form" or has "a significant cost or administrative impact on contractors or offerors."

77.     Both the Task Force Directive and the OMB Rule adopting the Task Force Directive are subject to each of these requirements. No officer authorized to issue a procurement policy, regulation, or procedure invoked the waiver exception codified in 41 U.S.C. § 1707(d); *see also id.* § 1707(e) (stipulating that a procurement policy for which the requirements of subsections (a) and (b) have been waived is only effective on a temporary basis and the agency must provide a 30-day public comment period after it becomes effective). Indeed, the government's failure to invoke the waiver exception demonstrates that there exists no reason that the requirements of notice and comment were impracticable.

78.     The OMB Rule and Task Force Directive were issued in violation of the procedural requirements of the Policy Procurement Act.

**COUNT 3**
**Arbitrary and Capricious Agency Action**
**(OMB Rule)**

79.     The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

80.     The OMB is an agency within the Executive Office of the President.

81.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." *See* 5 U.S.C. § 706 (2)(A). "[A]gency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). An agency "rule" is defined as "the whole or a part of an agency statement of

general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." *Id.* § 551(4).

82.     An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

83.     The OMB Rule contains no explanation or reasoning at all. 86 Fed. Reg. at 53,691–92. Mere executive fiat falls well short of the requirement of a "satisfactory explanation."

84.     The OMB Rule is arbitrary and capricious and must be set aside.

### COUNT 4
### FAR Council Directive and Deviation Clause Exceeds
### Statutory Authority and Is Not in Accordance with Law

85.     The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

86.     While the FAR Council clams to be issuing only "guidance," the guidance is being "applied . . . in a way that indicates it is binding." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). Therefore, the FAR Council Guidance is an agency action subject to judicial review under the APA.

87.     Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C).

88.     The FAR Council exists to promulgate procurement policy. 41 U.S.C. § 1302.

89.     The FAR Council Guidance admits that it is issued to further the goal of the Task Force Directive and Executive Order, namely, to "get[] more people vaccinated." FAR Council Guidance at 1, 3. There is no connection between this requirement and the legitimate procurement policy objectives authorized by law.

90.     The FAR Council did not act in accordance with the law and exceeded its statutory authority when it issued the Guidance and Deviation Clause creating a government-wide policy mandating vaccines for contractors.

### COUNT 5
### Failure to Conduct Notice and Comment
### (FAR Council Guidance and Deviation Clause)

91.     The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

92.     As discussed in Count 2, 41 U.S.C § 1707(a)–(b) requires procurement "polic[ies], regulation[s], procedure[s], or form[s]" to go through notice and comment.

93.     While agencies are treating the FAR Council Guidance as binding, even if it were not binding, 41 U.S.C. § 1707(a)–(b) requires *policies* to go through notice and comment.

94.     A FAR deviation is a procurement policy, regulation, procedure or from that requires notice and comment.

95.     Because the FAR Council Deviation Clause was issued without notice and comment, it is invalid and must be set aside.

## COUNT 6
### Carnahan, Nelson, and Austin Acted *Ultra Vires* in Promulgating the FAR Guidance and Deviation Clause.

96.     The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

97.     Under 41 U.S.C. §§ 1301–1303(a), the Administrator of General Services, the Secretary of Defense, and the Administrator of NASA constitute the FAR Council, and the FAR Council is authorized to "jointly issue and maintain . . . a single Government-wide procurement regulation, to be known as the Federal Acquisition Regulation."

98.     The FAR Council is charged with "manag[ing], coordinat[ing], control[ing], and monitor[ing] the maintenance of, issuance of, and changes in, the [FAR]." 41 U.S.C. § 1303(d).

99.     As discussed in Count 4, the FAR Council did not act in accordance with the law and exceeded its statutory authority when it issued the Guidance and Deviation Clause creating a government-wide policy mandating vaccines for contractors.

100.    Defendants Carnhan, Nelson, and Austin, as the Administrator of General Services, the Secretary of Defense, and the Administrator of NASA, respectively, acted *ultra vires* and exceeded the scope of their statutory authority.

## COUNT 7
### Violation of the U.S. Constitution, Art. I, §1
### Unconstitutional Delegation of Legislative Power

101.    The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

102.    Pursuant to Article I, § 1 of the U.S. Constitution, "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." Under Article I, § 1 only Congress may engage in lawmaking.

103.    "Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935).

104.    The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government.

105.    While Congress may delegate power to executive agencies, the statutory delegation must include an intelligible principle to which the delegee "is directed to conform." *J.W. Hampton, Jr., & Co v. U.S.*, 276 U.S. 394, 409 (1928).

106.    The nondelegation doctrine is based on the principle of preserving the separation of powers.

107.    The President's delegation in EO 14042 to the OMB Director and Task Force and indirect delegation to the agencies of such broad authority and discretion is not supported by a statutory directive within the Procurement Act or any other federal law. The precatory statement or purpose in the Procurement Act is not a clear directive, and the President cannot rely on it to impose an intrusive and sweeping vaccine mandate.

108.    The President's actions lack the requisite congressional direction to support such a broad delegation of power for two reasons. First, Congress' grant of authority to the President in the Procurement Act does not provide any basis that authorizes the President to implement a national vaccination mandate scheme by executive order. Second, even if 40 U.S.C. § 121(a) could be read

in such a way as to show that Congress had clearly authorized the President to implement a national vaccination mandate for federal contractors, Congress did not articulate an intelligible principle authorizing the President to delegate legislative judgment to the Task Force or the OMB Director.

109.    Without explicit congressional authorization, the President's delegation of power in the Executive Order and through the OMB Determination and the Task Force is an unconstitutional delegation of legislative authority which cannot survive constitutional scrutiny.

**COUNT 8**
**Violation of the U.S. Constitution**
**Unconstitutional Exercise of the Spending Power**

110.    The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

111.    EO 14042, the OMB Rule, the Task Force Directive, and the FAR Council Guidance and Deviation Clause are unconstitutional conditions on the State's receipt of federal funds.

112.    "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously," so "States [can] exercise their choice knowingly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The executive branch cannot impose conditions on spending that the Constitution would prohibit it from imposing directly, because that authority belongs to Congress. *See id.* at 17.

113.    Federal contracts are an exercise of the Spending Clause, yet the challenged actions ask Texas to agree to an ambiguous contract term—specifically, agreeing to comply with uncertain Task Force Directive and FAR Guidance and Deviation Clause that were not issued in accordance with the law. Moreover, the Contractor Mandate could not be imposed directly by Defendants in

accordance with the Constitution, and therefore it cannot be imposed as a condition of federal contracting and procurement regulation.

114.     The Contractor Mandate exceeds the authority granted to the federal government by the constitution.

## VII.     DECLARATORY JUDGMENT

115.     The allegations in each of the preceding paragraphs are expressly incorporated herein as if restated in full.

116.     The federal Declaratory Judgment Act authorizes federal courts to declare the rights of litigants. 28 U.S.C. § 2201. The issuance of a declaratory judgment can serve as the basis for an injunction to give effect to the declaratory judgment. *Steffel v. Thompson*, 415 U.S. 452, 461 n. 11 (1974).

117.     For the reasons described in each of the previous counts, Texas is entitled to a declaratory judgment that the Defendants are violating the law and the Contractor Mandate is unlawful, unconstitutional, and unenforceable.

## VIII.   PRAYER FOR RELIEF

For these reasons, Plaintiff State of Texas respectfully requests that the Court:

i.    Hold unlawful and set aside the Executive Order, the OMB Rule, the FAR Council Directive and Deviation Clause, and the Task Force Directive.

ii.    Issue declaratory relief declaring the Defendants' actions unlawful.

iii.    Issue preliminary and permanent injunctive relief enjoining Defendants from enforcing the Executive Order, the OMB rule, the Task Force Directive, and the FAR Council Directive and Deviation Clause.

iv.    Award Plaintiff costs and reasonable attorneys' fees.

v.    Award such other relief as the Court deems equitable and just.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil
Litigation

**THOMAS A. ALBRIGHT**
Chief, General Litigation Division

*/s/ Christopher D. Hilton*
**CHRISTOPHER D. HILTON**
Deputy Chief, General Litigation Division
Texas State Bar No. 24087727
Christopher.Hilton@oag.texas.gov

**HALIE ELIZABETH DANIELS**
Assistant Attorney General
Texas State Bar No. 24100169
Halie.Daniels@oag.texas.gov

**AMY SNOW HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
Amy.Hilton@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**ATTORNEYS FOR PLAINTIFF**