# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

| | | |
|---|---|---|
| **THE STATE OF TEXAS,** | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 3:21-CV-309** |
| | § | |
| **JOSEPH R. BIDEN, in his official** | § | |
| **capacity as President of the United** | § | |
| **States, et al.,** | § | |
| *Defendants.* | § | |

---

## THE STATE OF TEXAS'S
## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

---

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief, General Litigation Division

**CHRISTOPER D. HILTON**
Deputy Chief for General Litigation Division
Texas State Bar No. 24087727
So. Dist. No. 3029796
Christopher.Hilton@oag.texas.gov

**AMY S. HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
Amy.Hilton@oag.texas.gov

**HALIE ELIZABETH DANIELS**
Assistant Attorney General
Texas State Bar No. 24100169
So. Dist. No. 3380631
Halie.Daniels@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667

**COUNSEL FOR THE STATE OF TEXAS**

Under the pretense of increasing efficiency and economy in federal contracting, President Biden issued an Executive Order requiring the implementation of a COVID-19 vaccine mandate on millions of Americans, forcing those who work with federal contractors to choose between their fundamental constitutional rights and their livelihoods.[1] This sweeping mandate is part of the President's unconstitutional efforts to revitalize his "flagging vaccination campaign"[2] at the cost of individual liberty. President Biden's vaccine campaign is intended to "affect almost every aspect of society"[3] and his weaponization of the administrative state against federal contractors is an unprecedented overreach.

The Texas response to COVID-19 has been to protect individual liberty while promoting effective public health and safety measures, and Governor Abbott's executive orders prohibit any governmental or private entity in Texas from requiring anyone to obtain a vaccine.[4] But President Biden has expressed disdain for this approach, announcing he would "use [his] power as president to get [Republican governors] out of the way."[5] Whatever President Biden hopes to achieve politically cannot be paid for by Texans' livelihoods or the nullification of their Constitutional rights. Defendants and other federal agencies have already

---

[1] *Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies*, https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/04/fact-sheet-biden-administration-announces-details-of-two-major-vaccination-policies/ (last visited Nov. 14, 2021), attached as Exhibit A; 86 Fed. Reg. 50,985–88 (Dkt. #1-2 at 2–5).

[2] *See* Tamara Keith, *Biden Hopes to Boost COVID Vaccination Rates by Focusing on Federal Workers*, NPR, https://www.npr.org/2021/07/29/1022189074/biden-hopes-to-jolt-covid-vaccination-rates-by-focusing-on-federal-workers (last visited Nov. 14, 2021).

[3] Katie Rogers and Sheryl Gay Stolberg, *Biden Mandates Vaccines for Workers, Saying 'Our Patience Is Wearing Thin*,'" THE NEW YORK TIMES, https://www.nytimes.com/2021/09/09/us/politics/biden-mandates-vaccines.html (last visited Nov. 14, 2021).

[4] Exec. Order No. GA-39 (Aug. 25, 2021), attached as Exhibit B; Exec. Order No. GA-40 (Oct. 11, 2021), attached as Exhibit C.

[5] *Supra* n.3.

begun to roll out this vaccination mandate, and irreparable harm will occur each day that it is not enjoined. Contractors are *already* being forced to accept the mandate for new contracts, and federal agencies are requiring the amendment of existing contracts with little notice and onerous deadlines—including where the State of Texas is the contractor.

Because Defendants' Contractor Mandate[6] is causing imminent and irreparable harm, the State of Texas respectfully requests that the Court enter a temporary restraining order and preliminary injunction prohibiting Defendants from implementing the Contractor Mandate and enjoining Defendants from requiring federal contractors to receive COVID-19 vaccinations.

## I.   FACTUAL BACKGROUND

### A.   Biden Administration's Vaccine Policies in Response to COVID-19

"After the President voiced his displeasure with the country's vaccination rate in September, the Administration pored over the U.S. Code in search of authority, or a 'work-around,' for imposing a national vaccine mandate." *BST Holdings, L.L.C. v. OSHA*, No. 21-60845, slip op. at 7-8 (5th Cir. Nov. 12, 2021), attached as Exhibit D. On September 9, 2021, President Biden announced that, through three different mandates, in excess of 80 million American workers would be required to get vaccinated. First, through the Department of

---

[6] As used herein, the "Contractor Mandate" includes Executive Order 14042 (86 Fed. Reg. 50,985–88 (Dkt. #1-2 at 2–5)), the OMB Rule (86 Fed. Reg. 53,691–92 (Dkt. #1-2 at 22–23)), the Task Force Directive (Safer Federal Workforce Task Force, *COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors* (Dkt. #1-2 at 7–20)), and the FAR Council Directive and accompanying Deviation Clause (Memorandum from FAR Council to Chief Acquisition Officers et al. re: Issuance to Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021) (Dkt. #1-2 at 25–29)).

Labor, an emergency rule would be issued "requir[ing] more Americans to be vaccinated"[7] by imposing "new vaccination requirements"[8] that "require all employers with 100 or more employees, that together employ over 80 million workers, to ensure their workforces are fully vaccinated or show a negative test at least once a week."[9] Next, President Biden announced that the Centers for Medicare and Medicaid Services ("CMS") would issue a rule mandating vaccines for employees who work at healthcare facilities that accept Medicare and Medicaid.[10] Finally, the President announced that he would "sign an executive order which would require all executive branch federal employees to be vaccinated—all."[11] In the same breath, President Biden also announced he had already "signed another executive order that will require federal contractors to do the same."[12]

Following President Biden's remarks at the White House, he issued Executive Order 14042 (the "Executive Order") directing the Safer Federal Workforce Task Force (the "Task Force") to develop guidance in accordance with his edicts.[13] The Executive Order also

---

[7] The Occupational Safety and Health Administration ("OSHA") sent a proposed emergency temporary standard ("ETS") to the White House for review. *OSHA Sends Employer Vaccine Rule to White House for Final Review*, https://news.bloomberglaw.com/daily-labor-report/osha-sends-employer-vaccine-rule-to-white-house-for-final-review (last visited Nov. 13, 2021). The OSHA regulation is at issue in a separate lawsuit, *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, No. 21-60845, filed in the Fifth Circuit Court of Appeals on November 5, 2021. The Fifth Circuit immediately granted an initial administrative stay, and after expedited briefing and further consideration, the court issued a full stay of the OSHA ETS pending judicial review. *BST Holdings*, slip op. at 2.

[8] Joseph Biden, Remarks by President Biden on Fighting the Covid-19 Pandemic (Sept. 9, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/09/09/remarks-by-president-biden-on-fighting-the-covid-19-pandemic-3/, attached as Exhibit E.

[9] *Id.*

[10] *Id.* The State of Texas will also challenge the illegal CMS mandate in court in a separate action.

[11] *Supra* n.8.

[12] *Id.*

[13] *Id.*

required the Office of Management and Budget ("OMB") Director to determine whether the Task Force's guidance would "promote economy and efficiency" in federal contracting and required the FAR Council to "amend the [FAR] to provide for including in [f]ederal procurement solicitations and contracts subject to this order" the contract clause discussed in the Executive Order.[14]

On September 28, 2021, without reasoning or explanation, OMB Director Young published a notice of determination in the Federal Register indicating that "compliance with COVID-19 related safety protocols improves economy and efficiency by reducing absenteeism and decreasing labor costs for contractors and subcontractors working on or in connection with a Federal Government contract."[15]

On September 30, 2021, the FAR Council issued its Directive.[16] The memo stipulated that one of the stated purposes of the FAR Council Directive was to "maximize the goal of getting more people vaccinated and decrease the spread of Covid-19."[17] The FAR Council's Directive developed a "Deviation Clause" to be inserted into covered contracts and subcontracts. The Deviation Clause imposes the Task Force's requirements, including the information contained in the Task Force Directive's Frequently Asked Questions.[18] *See* Dkt. #1-2 at 15–20.

---

[14] *Id.*

[15] *Id.*

[16] *See* Memorandum from FAR Council to Chief Acquisition Officers et al, re: Issuance of Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021), available at https://www.whitehouse.gov/wp-content/uploads/2021/09/FAR-Council-Guidance-on-Agency-Issuance-of-Deviations-to-Implement-EO-14042.pdf (last visited Nov. 14, 2021), attached as Exhibit F.

[17] *Id.*

[18] *Id.*

**B.**    **The Effect of the Vaccine Mandate on Texas**

The detrimental effects of Defendants' illegal actions will have a swift, devastating, and irreparable impact on the State of Texas. According to the federal government's own publicly available data, in the 2020-2021 fiscal year, the State of Texas (including arms of the State and governmental entities funded in whole or in part by the State) maintained a total potential value of prime contracts with the federal government in excess of $7.3 billion.[19] In the same fiscal year, the State of Texas maintained a total potential value of subcontracts with the federal government in excess of $20.3 million.[20] If the State of Texas does not acquiesce to the federal government's coercion, it stands to lose over $7.32 billion in future contracts.[21]

This staggering economic loss is not just an abstract number from a government database. Defendants' unilateral imposition of illegal conditions on these contracts has a real-world impact on programs and businesses that will have significant consequences for the State. For example, Texas Tech University ("Texas Tech") has a current contract with NASA for approximately $3 million, with an additional $1 million expected to be allocated for the final phase of the contracted project.[22] NASA has already requested that Texas Tech modify

---

[19] *See* USA Spending, https://www.usaspending.gov/ (last visited Nov. 13, 2021). This website is "[a]n official website of the U.S. government" and is subject to stringent and detailed reporting and accuracy requirements. *See* "About," USA Spending, https://www.usaspending.gov/about (last visited Nov. 13, 2021). Accordingly, this data falls squarely within the business and public records hearsay exceptions, *see* Fed. R. Evid. 803(6), (8), and the Court can and should take judicial notice of its contents, *see* Fed. R. Evid. 201. Moreover, the exhibits attached to this motion reflecting the contents of this database are admissible as summaries in order to permit and aid in convenient examination by the Court. *See* Fed. R. Evid. 1006.

[20] *Id.*

[21] *Id.*

[22] Declaration of Texas Tech University Vice Chancellor and General Counsel Eric Bentley, Exhibit G ¶¶ 6–8.

existing contracts.[23] Texas Tech does not want to risk losing future payments on current or future contracts. Texas Tech stands to lose many millions of dollars from federal contracts if it does not comply with Defendants' vaccination requirement.[24]

The Texas Department of State Health Services ("DSHS") maintains contracts with the federal government in the tens of millions.[25] If DSHS fails to comply with this vaccine mandate, programs such as vital statistics and cancer research will be detrimentally affected.[26] Specific to DSHS Community Health programs, DSHS contracts with the federal government in excess of $8.87 million[27] which partially funds DSHS' Texas Cancer Registry.[28] If DSHS fails to comply with the Contractor Mandate, the Texas Cancer Registry stands to lose funding for 11.25 new full-time positions and funding to update outdated software.[29] Further DSHS contracts with the Pregnancy Mortality Surveillance System to provide data regarding pregnancy-associated deaths and corresponding birth or fetal death.[30] The ability to provide quality and accurate data to the Center for Diseases Control is of national importance; accurate death data results in improvements in strategies to avoid preventable deaths.[31] Loss of these federal contracting dollars would erect substantial barriers to DSHS's ability to effectively implement the work and mission of the agency.

[23] Email from NASA Contracting Officer Wade S. Amis, Exhibit H.
[24] *Supra* n.22.
[25] Declaration of the Texas Department of State Health Services Associate Commissioner for Community Health Dr. Manda Hall, Exhibit I, ¶ 2.
[26] *Id.* ¶¶ 3–6.
[27] *Id.* ¶¶ 4.
[28] *Id.*
[29] *Id.*
[30] *Id.* ¶ 5-6.
[31] *Id.* ¶ 6.

The Texas Workforce Commission ("TWC") also maintains several contracts with the federal government worth tens of millions of dollars. One of TWC's programs, the Vocational Rehabilitation program, supports people with disabilities in preparing for, obtaining, maintaining, and advancing in meaningful employment. It currently holds a contract with a face value of just under $69 million.[32] Within Vocational Rehabilitation are programs like the Business Enterprises of Texas ("BET") which provide opportunities for legally blind individuals to manage food service facilities on state, federal, and private properties.[33] One of the many duties of the BET is to service four federal military base cafeterias within the State of Texas.[34] TWC has already been contacted by a Contract Specialist from Joint Base San Antonio requesting a contract modification adopting the FAR Council's Directive.[35] Losing any BET contracts or permits will result in substantial harm to the BET program and TWC's ability to provide employment opportunities for legally blind Texans.[36]

Federal data show that hundreds of other governmental entities who contract with the United States have been or will be put in the same position as Texas Tech, DSHS, and TWC.[37] In the face of Defendants' unlawful overreach, contractors face the same choice that they are forced to impose on their employees: accept the unlawful conditions imposed by Defendants or risk the federal contracts that may form the foundation of a key program or even entire

---

[32] Affidavit of Cheryl Fuller, Director of the Vocational Rehabilitation program of the Texas Workforce Commission, Exhibit J, ¶ 7.
[33] *Id.* ¶ 3.
[34] *Id.* § 6.
[35] *Id.* ¶ 7–8.
[36] *Id.* ¶ 9.
[37] *See* 2021 Federal Prime Contracts with State Government, Exhibit K; 2021 Federal Sub Contracts with State Government, Exhibit L. These exhibits reflect data extracted from the USA Spending website without any substantive modification, and are admissible evidence. *See supra* n. 19.

businesses. Further, because of the threat of retribution, it makes no economical or logical sense for a federal contractor to challenge Defendants' actions. Even if the contractor were to succeed in Court, it would still stand to permanently lose federal contracts and all associated sources of revenue in retaliation. Accordingly, Defendants' coercive tactics may leave many contractors with no ability to appeal to the judiciary to protect their rights.

Additionally, the State of Texas's labor market is threatened as a result of the Contractor Mandate—which will cause significant, concrete financial harm to the State in the form of unemployment benefits and increased Medicaid expenses. TWC reports that each individual unemployment claim, paid each Sunday for 52 weeks, is at a minimum worth $3,640 and at a maximum worth $27,820.[38] Each person who is forced into unemployment because Defendants are seeking to condition their livelihoods on the violation of a religious or personal belief reflects an increased cost to the State. And there are countless Texans who could be affected.

Across the State of Texas, people are already being confronted with the horrible reality that they may lose their jobs if they are not willing to lose their rights and abandon their convictions. Employees of the federal contractor Consolidated Nuclear Security LLC, Pantex Plant, ("Pantex"), indicate that they will be forced to quit their jobs if their requests for religious exemptions are not approved. Among those employees is a Senior Contract Administrator whose termination would cause a major disruption in Pantex operations and will place a devastating hardship on his family.[39] Another employee, the Nuclear High

---

[38] *See* https://www.twc.texas.gov/jobseekers/eligibility-benefit-amounts (last visited Nov. 14, 2021).
[39] Declaration of Senior Contract Administrator for Consolidated Nuclear Security LLC, Pantex Plant, James Carducci, Exhibit M.

Explosive Operations Supervisor who supervises over 60 Pantex employees, attests that his termination could ultimately put national security at risk as it may cause delay in the shipment date of weapons.[40]

Michael Ford, a 36-year veteran of the nuclear industry and former member of the Texas Radiation Advisory Board and Chair of the Texas Low-Level Radioactive Waste Disposal Compact Commission, has personal knowledge of the nearly 100 Pantex employees who will be terminated if they do not accede to the vaccine mandate.[41] Mr. Ford attests that not only would their terminations cause massive disruption to the nuclear weapon enterprise, but their resignations also jeopardize the obligations of Department of Energy's National Nuclear Security Administration.[42] The disruption would directly impact the building, storing, repairing, and maintaining of nuclear weapons in the United States.[43]

Pilots and flights attendants of American Airlines indicate they will be forced to quit their jobs if their requests for religious exemptions are not approved. Among those employees is an American Airlines First Officer who flies international and domestic flights[44] and a 34-year veteran Flight Attendant whose resignation would have downstream effects on the operations of American Airlines.[45] If pilots and flight attendants are forced to resign *en masse*,

---

[40] Declaration of the Nuclear High Explosive Operations Supervisor for Pantex, Justin Whitehead, Exhibit N, ¶¶ 4, 10–12.
[41] Declaration of Michael Ford, Exhibit O, ¶¶ 2–5.
[42] *Id* at ¶ 9.
[43] *Id* at ¶ 19.
[44] Declaration of an American Airlines First Officer, Tinna Perlman, Exhibit P, ¶ 3.
[45] Declaration of Flight Attendant, Lori Arcayna, Exhibit Q.

the fallout could include flight cancellations, extreme delays, and the loss of highly-trained pilots—not to mention the detrimental effects on the affected families.[46]

Geoffrey Tahuahua, President of the Associated Builders and Contractors of Texas ("ABCTX"), a state chapter of the national Associated Builders and Contractors Association ("ABC"),  details the devastating effects the Contractor Mandate will have on his industry.[47] ABCTX and ABC, as a whole, represent many private businesses that regularly bid on and are awarded federal government contracts.[48] Both ABCTX and ABC's general contractors won 57% of the $118 billion in direct federal U.S. construction contracts exceeding $25 million awarded during fiscal years 2009-2020.[49] The Contractor Mandate will have a resounding effect on the already devastating nation-wide worker shortage where, in the construction industry alone, there is already a shortage of approximately 430,000 workers needed to fulfill the existing demands for construction in the U.S.[50] An August 2021 ABC survey of its federal contractor members found that 77% of survey respondents said vaccine mandates will increase costs on federal construction projects; only a measly 1.2% of survey respondents said that the vaccine mandate would decrease costs.[51] Finally, the ABC survey found that 49% of the survey respondents reported they would be less likely to bid on federal contracts subjected to vaccine requirements.[52]

---

[46] *See, e.g.*, Ex. Q, ¶¶ 4, 7; Ex. P ¶¶ 9–10, 13.
[47] Declaration of President of the Associated Builders and Contractors of Texas, Geoffrey Tahuahua, Exhibit R.
[48] *Id* at ¶ 4.
[49] *Id* at ¶ 8 n.5.
[50] *Id* at ¶ 9 n.6.
[51] *Id* at ¶ 10.
[52] *Id.*

These stories are only a handful of examples that illustrate the damage done by Defendants' illegal acts. There have also been numerous reports regarding the effects of Contractor Mandate on the Texas labor force since September 9, 2021.[53] With impending deadlines to comply with forced vaccination or lose billions of dollars in federal contracts, Texas stands to suffer imminent and irreparable harm.

## II.   ARGUMENT

A plaintiff seeking a temporary restraining order or preliminary injunction must establish (1) that it is likely to succeed on the merits of its claims, (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in his favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The standards for securing a temporary restraining order or preliminary injunction are substantively the same. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Texas v. U.S.*, 524 F. Supp. 3d 598, 651 (S.D. Tex. 2021). To preserve the status quo, federal courts have regularly enjoined federal agencies from implementing and enforcing new

---

[53] *See, e.g.*, Vaccine Mandate Could Make Nursing Home Staff Shortage Worse, September 10, 2021, https://www.newswest9.com/article/news/health/coronavirus/vaccine/vaccine-mandate-nursing-home-staff-shortage/513-02e9c098-14c3-4311-bfc5-e8144c8fe1b3 (last visited Nov. 14, 2021); Job Creators Network says companies losing 30% of workforce due to vaccine mandate, https://katv.com/news/nation-world/job-creators-network-says-companies-losing-30-of-workforce-due-to-vaccine-mandate (last visited Nov. 14, 2021); Raytheon warns of worker losses as companies impose vaccine mandate, https://www.reuters.com/business/healthcare-pharmaceuticals/raytheon-will-lose-several-thousand-workers-due-covid-19-vaccine-mandate-ceo-2021-10-26/ (last visited Nov. 14, 2021); Business group warns of mass layoffs and 'catastrophic' supply chain disruptions from Biden vaccine mandate, https://www.cnn.com/2021/10/22/business/vaccine-supply-chain-biden/index.html (last visited Nov. 14, 2021); Taylor Mitchell, "Amarillo Bell Helicopter employees hold peaceful protest regarding COVID-19 vaccine mandate," KFDA (Oct. 20, 2021), available at https://www.newschannel10.com/2021/10/21/amarillo-bell-helicopter-employees-hold-peaceful-protest-regarding-covid-19-vaccine-mandate/ (last visited Nov. 14, 2021); *see also, e.g.*, *Sw. Pilots Ass'n v. Sw. Airlines*, No. 3:21-cv-02608-M (N.D. Tex. filed Oct. 20, 2021).

regulations pending litigation challenging them. *See, e.g., Texas v. U.S.*, 787 F.3d 733 (5th Cir. 2015) (enjoining executive order inconsistent with immigration statutes); *Texas v. U.S.*, 524 F. Supp. 3d at 667.

**A.    Texas is likely to succeed on the merits of its claims.**

Executive Orders and the rules and agency guidance that implement them are subject to judicial review. *Gomez v. Trump*, 485 F. Supp. 3d 145, 177 (D.D.C. 2020); *see also Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 232 (5th Cir. 2006); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996); *Associated Builders & Contractors of Se. Tex. v. Rung*, Civ. A. No. 1:16-cv-425, 2016 WL 8188655, at *5 (E.D. Tex. Oct. 24, 2016). Texas challenges the Executive Order and its implementation by Defendants on both statutory and constitutional grounds and is likely to succeed on the merits of its claims, because the Contractor Mandate is unlawful. First, the President acted *ultra vires* in issuing the Executive Order. Second, Defendants failed to conduct notice and comment as required under the Procurement Policy Act. Third, the Contractor Mandate violates the APA, and the members of the FAR Council acted *ultra vires* when they issued the FAR Guidance and its accompanying Deviation Clause. Finally, the Contactor Mandate violates the United States Constitution.

**1.    The President acted ultra vires in issuing the Executive Order.**

Executive Orders issued pursuant to the President's authority under the Procurement Act are subject to judicial review. *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1330 (D.C. Cir. 1996). When the President exceeds his authority under the Procurement Act, the President acts *ultra vires* and the Executive Order may be deemed unconstitutional. *See id.* at 1328; *see also Gomez*, 485 F. Supp. 3d at 177 (holding that challenges to a president's executive order can be

brought as either an *ultra vires* claim or a statutory cause of action). The President acted *ultra vires* in issuing the Executive Order for two reasons. First, the Executive order does not have any nexus to the purposes of the Procurement Act. Second, the President does not have the authority under the Procurement Act to issue government-wide procurement regulations.

a.   *The Executive Order does not have any nexus to the purpose of the Procurement Act.*

The purpose of the Procurement Act is to provide the Federal Government with an "economical and efficient system" for, among other things, procuring and supplying property and nonpersonal services. 40 U.S.C. § 101. The Procurement Act permits the President to prescribe certain "policies and directives" within the scope of the Act. 40 U.S.C. § 121(a). Necessarily, he also lacks power to issue directives completely unrelated to contracting and instead based on his own social and public health policy preferences. *Cf. BST Holdings*, slip op. at 12 (recognizing that stated rationale for related OSHA vaccination mandate was "pretextual"). The President's power under the Procurement Act must be exercised consistently with the structure and purposes of the statute that delegates that power—namely, efficiency and economy in procurement. *See Reich*, 74 F.3d at 1330. The President may only issue executive orders that have a "reasonably close nexus" to those purposes of the Procurement Act; he does not have unfettered authority to issue directives based simply on what "he believes will likely result in savings to the government." *Id.* at 1330–31; *see Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 171 (4th Cir. 1981); 40 U.S.C. § 101.

Here, the link between the Contractor Mandate and economy and efficiency is far too attenuated to lie reasonably within the contemplation of the Procurement Act. For example,

under the Task Force Directive, a "covered contractor workplace" includes any location controlled by a covered contractor where a covered contract employee is likely to be present. Dkt. #1-2 at 10. This would require entire contractor offices to be vaccinated even if only one employee has a tangential connection to a covered contract. At the same time, a "covered contractor workplace" does not include the residence of an individual working on a covered contract, which leads to the result that an employee working remotely who works "on or in connection with" a covered contract is required to be vaccinated, although a family member in the same household who works for the same contractor (but not on a covered contract) is not. These rules and their outcomes are nonsensical. There is no efficiency gained by Defendants' one-size-fits-all, overbearing, and coercive approach to the multi-faceted and difficult question of how to fight COVID-19 *and* preserve individual liberty.

Moreover, the Executive Order is on even shakier ground in its extension to subcontractors, as subcontractors have "no direct connection to federal procurement." *Liberty Mut. Ins. Co.*, 639 F.2d at 171. As such, Defendants must demonstrate both that the requirements of the Executive Order on subcontractors bear a reasonably close nexus to the purposes of the Procurement Act *and* that the statutory grant of authority to the President reasonably contemplates the President's authority to impose those requirements on subcontractors. *Id.* at 168, 170.

The case for "efficiency and economy" in federal contracting is further undermined by the overwhelming evidence of the *negative* consequences of the Contractor Mandate. Resignations or layoffs of unvaccinated employees of federal contractors do nothing to aid these purposes. In Texas, many areas of the economy and workforce are threatened by

Defendants' illegal acts, and rising unemployment would result in direct financial harm to the State.[54] The evidence of economic disruption is too overwhelming to ignore, yet Defendants have scarcely considered it.[55]

Defendant's attempt to impose sweeping controls on many millions of Americans via procurement is a question of deep economic and political significance, and Congress did not intend—nor does the Procurement Act allow—the President to exercise such broad authority under the guise of "procurement" in the absence of clear and explicit congressional authorization. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (holding that Congress must "speak clearly if it wishes to assign . . . decisions of vast economic and political significance"). The COVID-19 virus "does not remove constitutional limitations safeguarding essential liberties," and it does not extend the President's authority under the Procurement Act. *Id.* (quoting *Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398, 426 (1934)). "Whatever power the United States Constitution envisions for the Executive . . . it most assuredly envisions a role for all three branches when individual liberties are at stake." *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004). This is particularly poignant here where the Executive Order requires Texans to receive a vaccination—an act that can never be undone.

The Procurement Act does not authorize the President to achieve his public health or social policy objectives through COVID-19 vaccination mandates. The President exceeded his statutory authority and acted *ultra vires* in issuing the Executive Order.

---

[54] *See* https://www.twc.texas.gov/jobseekers/eligibility-benefit-amounts; *see also* Exs. M–Q.

[55] *See id.*

*b.   The Executive Order exceeds the President's grant of authority.*

The Procurement Act permits the President to prescribe certain "policies and directives" within the scope of the Act. 40 U.S.C. § 121(a). This grant of authority to the President is distinct from that of the GSA Administrator: while the President is authorized to prescribe "policies and directives," the Administrator "may prescribe *regulations*." 40 U.S.C. § 121(a), (c) (emphasis added); *see also Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) ("[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended."). Under the Procurement Policy Act (and subject to only limited exceptions), the FAR Council has the exclusive authority to issue "a single [g]overnment-wide procurement regulation." 41 U.S.C. § 1303(a)(1).[56] The Procurement Act does not authorize the President to issue government-wide procurement regulations with the force and effect of law. But that is exactly what the President does in his Executive Order. The President's Executive Order demands the FAR Council "amend the [FAR] to provide for inclusion in [f]ederal procurement solicitations and contracts subject to this order" the contract clause discussed in the Executive Order and directs agencies to implement the contract clause in contracts not covered by the FAR. 86 Fed. Reg. at 50,986. The power to amend the FAR—with government-wide effect—rests only

---

[56] The Procurement Policy Act allows the OFPP Administrator to issue government-wide regulations if the Department of Defense, NASA, and GSA are unable to agree on or fail to issue regulations. 41 U.S.C. § 1121(d). The OFPP Administrator may also remove a regulation if it is inconsistent with the FAR. *Id.* § 1303(a)(5).

with the FAR Council. 41 U.S.C. § 1303(a)(1)–(2).[57] Simply put, the President's arrogation of this authority to himself is unlawful.

The Procurement Act contains no authority for the President to leverage the federal government's procurement authorities into a nationwide vaccine mandate in the name of promoting "economy and efficiency." And the Procurement Act itself certainly does not authorize a vaccine mandate. Such a brazen assumption of power violates the Major Questions Doctrine. Congress does not delegate decisions of major economic and social significance "in so cryptic a fashion." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160–61 (2000).[58] "Courts expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *BST Holdings*, slip op. at 22 (Duncan, J., Concurring) (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021)) (cleaned up) The grant of authority to the President through the Procurement Act is limited, and the President has acted *ultra vires* in issuing the Executive Order and imposing the Contractor Mandate.

## 2. Defendants failed to conduct notice and comment under the Procurement Policy Act.

The FAR Council Directive and Deviation Clause, OMB Rule, and Task Force Directive all suffer the same defect: Defendants failed to conduct notice and comment required under 41 U.S.C. § 1707(a)–(b). Under 41 U.S.C. § 1707(a)–(b), a procurement "policy,

---

[57] Indeed, the FAR itself requires notice and comment for "proposed significant revisions" to it. 48 C.F.R. § 1.501–2; *see* Part II(A)2 *infra*.

[58] Even if the Court considers 40 U.S.C. § 121(a) to give the President broad authority, courts "do not construe broad grants of authority . . . as assigning [judicially] unreviewable decisions of vast economic and political significance." *See Texas v. U.S.*, 787 F.3d at 760–61.

regulation, procedure, or form" must go through notice and comment if it "relates to the expenditure of appropriated funds" and either "has a significant effect beyond the internal operating procedures of the agency issuing the policy, regulation, procedure, or form" or has "a significant cost or administrative impact on contractors or offerors." "[T]he language of [§ 1707] is broad" and applies to "any procurement policy, regulation, procedure, or form . . . relating to the expenditure of appropriated funds" "down to the lowest level"—in other words, "*all* procurement regulations." *Munitions Carriers Conf., Inc. v. United States*, 932 F. Supp. 334, 338 (D.D.C. 1996), *rev'd on other grounds*, 147 F.3d 1027 (D.C. Cir. 1998) (internal quotation marks omitted) (emphasis added). The FAR Council Directive and Deviation Clause, OMB Rule, and Task Force Directive are all subject to the notice and comment requirement as procurement regulations. They all relate to the expenditure of appropriated funds, have a significant effect beyond internal operating procedures, and impose a significant cost and administrative impact on Texas and contractors in Texas.[59]

Though framed as non-binding guidance, agencies are treating the FAR Council Directive as binding.[60] *See Texas v. EEOC*, 933 F.3d 433, 441–42 (5th Cir. 2019) (explaining that agency action treated as binding is reviewable as a final agency action); *see also Texas v. U.S.*, 787 F.3d at 764 (explaining that an agency's characterization of its own action as "guidance" or a "policy statement" is not determinative). The FAR Council Directive goes so far as to give pre-approval of the Deviation Clause, providing that "agencies that adopt the [deviation] clause language without change in their deviations will be presumed to have

---

[59] Exs. G, J, M–R.
[60] Exs. G–J.

consulted with the Chair of the Civilian Agency Acquisition Council" as "required by FAR 1.404(a)(1)." Dkt. #1-2 at 27.[61]

Even if it were not binding, the FAR Council Directive is still a procurement "policy" subject to the notice and comment requirements of 41 U.S.C. § 1707. The Procurement Policy Act's notice and comment requirement applies to non-binding "policies." Courts "must give effect, if possible, to every clause and word of a statute." *Loughrin v. United States*, 573 U.S. 351, 358 (2014) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Here, Congress's inclusion of both regulations and policies in the notice and comment requirement indicates its intent to cover non-binding government policy pronouncements. *See Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.").

Moreover, the FAR itself requires "significant revisions" to the FAR be posted for notice and comment. 48 C.F.R. § 1.501-2. "Significant revisions" includes any revisions "which have a significant cost or administrative impact on contractors or offers, or a significant effect beyond the internal operating procedures of the issuing agency." *Id.* § 1.501-1. Changes to the FAR that do *not* require notice and comment include "editorial, stylistic, or other revisions that have no impact on the basic meaning of the coverage being revised." *Id.* The FAR Council Directive implementing the Task Force Directive is clearly a significant revision that required

---

[61] Similarly, the Executive Order stipulates that contractors' and subcontractors' compliance with the Task Force Directive is mandatory: "[T]he Safer Federal Workforce Task Force (Task Force) shall, as part of its issuance of Task Force Guidance, provide definitions of relevant terms for contractors and subcontractors, explanations of protocols *required of contractors and subcontractors* to comply with workforce safety guidance, and any exceptions to Task Force Guidance that apply." Dkt. #1-2 at 1 (emphasis added).

notice and comment. Simply put, Defendants were required to go through the notice-and-comment procedure, and they failed to do so.

Defendants could only explain their failure to conduct notice and comment by invoking the exception in § 1707(d). But they have not—and cannot. That exception only applies when "urgent and compelling circumstances make compliance with the requirements impracticable," 41 U.S.C. § 1707(d), and it must be invoked by designating the action as "temporary" and providing a thirty-day comment period, *id.* § 1707(e). Defendants have not done so. And even if they had, there is no reason to think that notice and comment was impracticable; the entire globe has weathered COVID-19 for nearly two years now and access to vaccination is not new. *See BST Holdings*, slip op. at 7. And it makes sense that the Defendants did not invoke this exception, because—as the Biden Administration assures us—"the virus poses . . . little risk at all" to the "more than *seventy-eight* percent of Americans aged 12 and older either fully or partially inoculated against it." *Id.* at 11 (emphasis in original).

For these reasons, the FAR Council Directive and Deviation Clause, OMB Rule, and Task Force Directive are subject to notice and comment and violate the procedural requirements of the Procurement Policy Act, 41 U.S.C. §1707.

### 3. The Contractor Mandate violates the APA, and the members of the FAR Council acted *ultra vires*.

#### a. The OMB Rule and the FAR Council Directive and Deviation Clause are arbitrary and capricious.

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary and capricious." *See* 5 U.S.C. § 706 (2)(A). An agency action is arbitrary or capricious if it fails to "articulate a satisfactory explanation for its action including a rational connection

between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Neither the OMB Rule nor the FAR Council Directive contain any reasoning or explanation for how they promote economy and efficiency in procurement other than a boiler plate conclusory statement. 86 Fed. Reg. at 53,691–92. The Procurement Act's "policy directive to pursue economy and efficiency implicates numbers, measurement, and accountability and supplies a meaningful standard against which to evaluate an agency's exercise of discretion." *Diebold v. U.S.*, 947 F.2d 787, 796 (1991). Mere executive fiat falls well short of the requirement of a "satisfactory explanation." *See State Farm*, 463 U.S. at 43.

Neither the OMB Rule nor the FAR Council Directive provide any reasoning or explanation for how they promote economy and efficiency in procurement such that a Court could find a "rational connection between the facts found and the choice made." *See State Farm.*, 463 U.S. at 43. This alone renders both the OMB Rule and the FAR Council Directive arbitrary and capricious. "[W]here the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 136 S. Ct. 2117, 2125 (2016). Courts "do not defer to the agency's conclusory or unsupported suppositions," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010), nor are agency actions "involving an issue of deep economic and political significance" entitled to deference, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1242 (9th Cir. 2018) (cleaned up). And this Court cannot "supply a reasoned basis for the agencies' actions that the agencies themselves have not given." *Id.* (cleaned up).

Nor can the agency's litigation counsel. *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 50 (1983) ("courts may not accept appellate counsel's *post hoc* rationalizations for agency action").

Moreover, the OMB Rule and the FAR Council Directive do not promote economy and efficiency, as discussed above.[62] It is clear that the OMB Rule and Far Council Directive ignored costs to the States, which is a "centrally relevant factor when deciding whether to regulate." *Michigan v. EPA*, 576 U.S. 743, 752–53 (2015). "Consideration of cost reflects the understanding that reasonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." *Id.* (emphasis in original).

Further, the OMB Rule and the FAR Council Directive do not account for Texas's reliance interests on the previous policy of not requiring vaccines. *See Navarro*, 136 S. Ct. at 2126–27; *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914–15 (2020). "Because it is generally arbitrary or capricious to depart from a prior policy *sub silentio*, agencies must typically provide a detailed explanation for contradicting a prior policy, particularly when the prior policy has engendered serious reliance interests." *BST Holdings*, slip op. at 12. Neither the OMB Rule nor the FAR Council Directive explain how vaccination will promote economy and efficiency in procurement—much less explain why mandatory vaccination is now an issue within the ambit of the Procurement Act.

Finally, the purported purpose of the Contractor Mandate is a pretense. The OMB Rule's conclusory assertion that compliance with the Task Force Directive "will improve economy and efficiency by reducing absenteeism and decreasing labor costs" is pretextual and

---

[62] Exs. M–R.

a trojan horse for regulation of public health. Dkt. #1-2 at 23; *see Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019). The FAR Council Directive admits that the goal of the Executive Order and its implementation is "getting more people vaccinated and decreas[ing] the spread of COVID-19." Dkt. #1-2 at 27. President Biden himself has expressed little tolerance for those who do not share his views on vaccination, which he put on public display when he announced that his "patience was wearing thin" with Americans who choose not to receive the COVID-19 vaccine.[63] "After the President voiced his displeasure with the country's vaccination rate in September, the Administration pored over the U.S. Code in search of authority, or a 'work-around,' for imposing a national vaccine mandate." *BST Holdings*, slip op. at 7–8. And President Biden's public statements threatening to "use [his] power as President" against those who disagree with his views on vaccination leave no doubt that the true purpose of the Contractor Mandate is to exercise unprecedented control over social policy and public health in the most profound way. It strains credulity to suggest otherwise.

Courts are "not required to exhibit a naivete from which ordinary citizens are free." *Dep't of Commerce*, 139 S. Ct. at 2575. "The reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Id.* at 2575–76. And indeed, as the Fifth

---

[63] *Supra* n.8.

Circuit held last week, "courts have an affirmative duty *not* to" "turn a blind eye to the statements" of those promulgating these extreme mandates. *BST Holdings*, slip op. at 11.

      b.   *The FAR Council exceeded its statutory authority in issuing the FAR Council Directive and Deviation Clause.*

Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory . . . authority, or limitations, or short of statutory right." *See* 5 U.S.C. § 706(2)(A), (C). The FAR Council is a federal agency tasked with "assist[ing] in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in the Federal Government." 41 U.S.C. § 1302. But the FAR Council Directive admits that it (and the Deviation Clause) were issued to further the goal of the Task Force Directive and Executive Order, namely, to "get[] more people vaccinated." Dkt #1-2 at 25-27. There is no connection between this requirement and the legitimate procurement policy objectives it is authorized by law to promulgate.

The FAR Council exceeded its statutory authority in issuing the FAR Council Directive creating a government-wide vaccine mandate for contractors, and it is not shielded from judicial review merely because it was implementing the President's Executive Order. *See Reich*, 74 F.3d at 1328 ("That the 'executive's' action here is essentially that of the President does not insulate the entire executive branch from judicial review. . . [C]ourts have power to compel subordinate executive officials to disobey illegal Presidential commands." (internal quotation marks omitted)).

c. *Defendants Carnahan, Nelson, and Austin acted ultra vires.*

Under 41 U.S.C. §§ 1301–1303(a), the Administrator of General Services, the Secretary of Defense, and the Administrator of NASA constitute the FAR Council, and the FAR Council is authorized to "jointly issue and maintain . . . a single Government-wide procurement regulation, to be known as the Federal Acquisition Regulation."

The FAR Council is charged with "manag[ing], coordinat[ing], control[ling], and monitor[ing] the maintenance of, issuance of, and changes in, the [FAR]." 41 U.S.C. § 1303(d). As discussed above, the FAR Council did not act in accordance with the law and exceeded its statutory authority when it issued the Guidance and Deviation Clause creating a government-wide policy mandating vaccines for contractors. Accordingly, the members of the FAR Council, Defendants Carnahan, Nelson, and Austin, as the Administrator of General Services, the Secretary of Defense, and the Administrator of NASA, respectively, acted *ultra vires* and exceeded the scope of their statutory authority. *See Gomez*, 485 F. Supp. 3d at 177 (holding that *ultra vires* actions are available against Executive Branch officials who take action to implement a president's executive orders).

### 4. Defendants' actions violate the Constitution.

a. *Unconstitutional delegation of legislative power.*

If Defendants contend that the Procurement Act's delegation of authority to the Executive is so broad that it authorizes him to impose a vaccine mandate on contractors as a condition to procurement contracts, then the Procurement Act violates the nondelegation doctrine because it lacks any "intelligible principle" to guide the President's actions. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529–30 (1935). "In the absence of a clear

mandate" in the Procurement Act, "it is unreasonable to assume that Congress intended to give [the President] unprecedented power" over American social policy and public health. *See Indus. Union Dep't, AFL-CIO v. American Petroleum Inst.*, 448 U.S. 607, 645 (1980). And if it did, it would be unconstitutional under *A.L.A. Schechter* and *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). Accordingly, if Congress wanted to delegate this authority to the President through the Procurement Act—and there is no evidence that it did—then Congress's attempt to do so was unconstitutional.[64]

### b. *Violations of the Spending Clause.*

"The United States Constitution exclusively grants the power of the purse to Congress, not the President." *Trump*, 897 F.3d at 1231 (citing U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1). Without Congressional authorization, the President has no spending power of his own. *See id.; Trump*, 897 F.3d at 1234–35. President Biden is unlawfully imposing conditions on the receipt of federal funds—a matter not within his authority. *See id.; Trump*, 897 F.3d at 1233–35.

Moreover, while Congress has the authority to contract under the Spending Clause, U.S. Const. art. I, § 8, cl. 1, that power does not support the Contractor Mandate. "[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so

---

[64] Even if 40 U.S.C. § 121(a) could be read in such a way as to show that Congress had clearly authorized the President to implement a national vaccination mandate for federal contractors, the President is only authorized to further delegate his authority to officials confirmed by the Senate. *See* 3 U.S.C. § 301. Accordingly, the President's delegation of authority to the Task Force is unlawful, because the Task Force includes, for example, the Director of the CDC, who is not appointed pursuant to the Appointments Clause. *Cf.* Exec. Order 13991 (Jan. 20, 2021) (establishing the Task Force). Moreover, the President cannot delegate authority to implement the Contractor Mandate, because he himself does not possess authority to issue such a mandate. *See* Part II(A)(1)–(2) *infra*.

unambiguously," so "States [can] exercise their choice knowingly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

The Contractor Mandate fails to "unambiguously" establish the contractual terms. The Contractor Mandate conditions the receipt of federal funds on the States agreeing to a contract term that is subject to change. Dkt. #1-2 at 29. The FAR Council Directive explicitly states that contractors "shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, *as amended during the performance of this contract*." *Id.* (emphasis added).[65] Imposing such open-ended contractual requirements defies the clarity that the Spending Clause requires. *See Nat'l Federation of Indep. Bus. v. Sebelius*, 567 U.S. 519, 584 (2012) ("[T]he spending power . . . does not include surprising participating States with post-acceptance . . . conditions.").

Texas is unable to enter into a contract knowing the conditions on which it is based when changes may be made at any time. No contractor, whether a governmental entity or otherwise, could have known that Defendants would claim for themselves a police power that allowed them to force employees to undergo medical treatment as a condition of the contract. Accordingly, the attempt to do so here is unconstitutional.

**B.** <u>**Texas has standing and is irreparably harmed by the Contractor Mandate.**</u>

Texas faces an imminent, irreparable, sovereign injury from the Contractor Mandate. President Biden has previously announced that it is his "clear intention" to supersede and

---

[65] Indeed, the Task Force Directive has already been updated since the filing of this lawsuit. *See COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors*, Safer Federal Workforce Task Force, (Nov. 10, 2021), https://www.saferfederalworkforce.gov/downloads/ Guidance%20for%20Federal%20Contractors_Safer%20Federal%20Workforce%20Task%20Force_ 20211110.pdf, attached as Exhibit S.

preempt any State policies that differ from his mandates.[66] This assault stands in direct contradiction to Texas's GA-40, which bans any entity from requiring vaccination, and which carries the force and effect of state law.[67] Numerous courts have made clear that preventing the State from enforcing its laws is itself an irreparable harm. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) ("[T]he inability to enforce its duly enacted plan clearly inflicts irreparable harm on the State."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time [a State is blocked] from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Org for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020). When the State is blocked from implementing its laws, "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its law." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013); *Coal. For Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).

Moreover, the negative consequences of the Contractor Mandate also threaten to irreparably harm the State. Governmental entities with programs that provide vital services to both Texas and the nation as a whole could be eliminated.[68] Businesses, their employees, and families across the State and in many areas of the economy will be negatively impacted, with potentially devastating consequences for the State.[69] The State's traditional police power and its laws are threatened. *See BST Holdings*, slip op. at 16–17, 19 (holding that mandating "a person receive a vaccine or undergo testing falls squarely within the States' police power" and

---

[66] *Supra* n. 3, n.8.
[67] *Supra* n. 3; Exs.B–C.
[68] Exs. I–L.
[69] Exs. G–R.

States are irreparably harmed by federal overreach into their "constitutionally reserved police power over public health"). The loss of individual liberty and the trampling of religious freedom cannot be remedied. Simply put, if the Contractor Mandate is permitted to go into effect, the State of Texas's sovereignty will be affronted, and all Americans' rights will be forever diminished.

## C.      The balance of the equities and public interest favor preliminary injunctive relief.

When governmental action is implicated, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). In order to preserve the relative positions of the parties until a trial on the merits can be held, federal courts have regularly enjoined federal agencies from implementing and enforcing new regulations pending litigation challenging them. *Texas v. U.S.*, 787 F.3d at 733. Here, the status quo since the early days of the pandemic in January 2020 has been no federal vaccine mandates. Defendants should not be permitted to upset that status quo through the abuse of the arcane federal procurement process.

An injunction further promotes and protects the public interest by avoiding the myriad harms that Defendants' lawlessness will bring. Workers will be protected from having to choose between their jobs and their liberty, and an injunction promotes economy and efficiency during the current supply chain crisis, preventing disruptions within the federal contractor workforce.[70] The Texas economy and vital government programs will be protected.[71] And in addition to the overwhelming economic interests, the liberty interests at stake here "are not reducible to dollars and cents." *BST Holdings*, slip op. at 20. "The public

---

[70] *See* Exs.M–Q.
[71] *See* Exs. I–J.

interest is also served by maintaining our constitutional structure and maintaining the liberty of individuals to make intensely personal decisions according to their own convictions—even, or perhaps *particularly*, when those decisions frustrate government officials." *Id.*

Preventing Defendants' vaccination mandate from being imposed on federal contractors is both equitable and in the public interest. Every American would remain free to choose to get vaccinated, and businesses would remain free to impose other COVID-19 prevention measures that do not trample individual rights. Defendants could focus their efforts on persuading the public, not coercing it, and the constitutional framework of a limited federal government would remain intact. And what equities support Defendants' cause? In the name of "public health" they would convert the federal government into a police power that can reach any aspect of American life—including forcing Americans to undergo medical procedures. Whatever short-term benefit Defendants purport to achieve through their Contractor Mandate, it cannot possibly outweigh the destruction of an American way of life that is fundamentally threatened by their unlawful methods.

The balance of the equities and the public interest favor the intervention of the Court to preserve the status quo.

### III.   CONCLUSION

For the foregoing reasons, the State of Texas respectfully requests that the Court enjoin Defendants from implementing and enforcing the Contractor Mandate.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil  Litigation

**THOMAS A. ALBRIGHT**
Chief, General Litigation Division

*/s/ Christopher D. Hilton*
**CHRISTOPHER D. HILTON**
Deputy Chief, General Litigation Division
Texas State Bar No. 24087727
So. Dist. No. 3029796
Christopher.Hilton@oag.texas.gov

**HALIE ELIZABETH DANIELS**
Assistant Attorney General
Texas State Bar No. 24100169
So. Dist. No.  3380631
Halie.Daniels@oag.texas.gov

**AMY SNOW HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
So. Dist. No. 3350717
Amy.Hilton@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**COUNSEL FOR THE STATE OF TEXAS**

## CERTIFICATE OF CONFERENCE

I certify that I have conferred with counsel for Defendants at the U.S. Attorneys' office, and they have indicated they are opposed to the relief requested herein.

*s/ Christopher D. Hilton*
**CHRISTOPHER D. HILTON**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document and all attachments were filed via CM/ECF, causing electronic service on all counsel of record; were served on the U.S. Attorneys' office via email in accordance with their procedures; and are being served via certified mail.

*s/ Christopher D. Hilton*
**CHRISTOPHER D. HILTON**