# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### GALVESTON DIVISION

|  |  |
|---|---|
| THE STATE OF TEXAS,<br><br>                    Plaintiff,<br>      v.<br><br>JOSEPH R. BIDEN, *et al.*,<br><br>                    Defendants. | No. 3:21-cv-309 |

# DEFENDANTS' OPPOSITION TO
# PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## INTRODUCTION

Plaintiff State of Texas ("Texas") has sued the President and fourteen federal agencies or officials. Texas challenges Executive Order 14042 ("the EO" or "EO 14042") which, with respect to certain government contracts, directs federal agencies to include a clause requiring certain COVID-19 safety protocols—including vaccination requirements for contractor employees. Though Texas attempts to characterize the EO as an attack on "individual liberty," *see* Mot. Prelim. Inj., Dkt. 6 (hereinafter Mot.), Texas's suit is actually an attempt to upend the Federal Government's irrefutable right to contract on equal footing with others.

The EO solely relates to the President's authority to direct procurement policy across the Executive Branch. That authority is not regulatory in nature, but rather reflects the President's role as Chief Executive Officer of the Executive Branch acting as a market participant. The President's authority to direct the Federal Government's contracting policy is

1

well-settled and has with regularity included procurement- and supply-related decisions that also have broader social impact. Texas's arguments to the contrary are untenable and have been rejected by courts many times over, and its failure to demonstrate a likelihood of success on the merits dooms its request for a preliminary injunction.

Nor can Texas show irreparable harm. Texas has identified only one contract that will include the challenged provision. Whatever else can be said of the potential harm arising from the inclusion of vaccination provisions in that one contract, it cannot justify the sweeping, nationwide relief that Texas seeks here. Nor is the balance of equities and the public interest in Texas's favor. The Federal Government has a compelling interest in preventing the spread of COVID-19 among its contractors' employees and the members of the public with whom they interact.

At bottom, Texas is asking this Court to impose, through the extraordinary remedy of a preliminary injunction, Texas's view on what terms should be in contracts negotiated with the Federal Government—even for contracts in which Texas is not a party. That relief would constitute a remarkable intrusion into the ability of parties to enter into contracts on the terms they may choose. It would also cause enormous disruptions to the Federal Government's ability to receive services from contractors in an economic and efficient manner in light of the ongoing pandemic.  This Court should deny the requested relief.

## BACKGROUND AND PROCEDURAL HISTORY

### I.      The COVID-19 Pandemic

On January 31, 2020, the Secretary of Health and Human Services ("HHS") declared a public health emergency due to COVID-19, a respiratory disease caused by the novel

coronavirus, SARS-CoV-2. HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://perma.cc/VZ5X-CT5R. On March 13, 2020, the President declared the COVID-19 outbreak a national emergency. Declaring a Nat'l Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. ("FR") 15,337 (Mar. 18, 2020). In July 2021, the United States began to experience "a rapid and alarming rise in . . . COVID-19 cases and hospitalization rates," driven by an especially contagious strain. *See* Centers for Disease Control and Prevention ("CDC"), Delta Variant: What We Know About the Science (updated Aug. 26, 2021), https://perma.cc/4RW6-7SGB.[1] To date, more than 47 million Americans have been infected with COVID-19 and more than 770,000 have died from COVID-19. CDC COVID Data Tracker, as of Nov. 22, 2021, https://perma.cc/52QU-UQQ9.

## II.    Vaccination Requirements for Federal Contractors

On September 9, the President issued EO 14042 to "promote[] economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract or contract-like instrument." EO 14042 § 1. The EO explained that new safeguards would "decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." *Id.* Those safeguards would be set forth in guidance issued by the Safer

---

[1] The Court may take judicial notice of factual information available on government websites. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

Federal Workforce Task Force ("Task Force"), *id.* § 2(a), and become binding when the OMB Director, pursuant to a delegation of the President's statutory authority, determined the guidance would "promote economy and efficiency in Federal contracting if adhered to by Government contractors and subcontractors." *Id.* § 2(c) (citing 3 U.S.C. § 301).

Pursuant to the EO, the President, as the ultimate manager of federal procurement, directed federal executive departments and agencies to incorporate a clause (a "COVID-19 safety clause") implementing the Task Force's guidance into certain contracts. Specifically, federal executive departments and agencies, "to the extent permitted by law," are to incorporate the COVID-19 safety clause into new contracts, new solicitations for a contract, extensions or renewals of an existing contract, and exercises of an option on an existing contract if those contracts also fall into one of the following categories (all requirements together, "covered contracts"): (i) a procurement contract for services, construction, or a leasehold interest in real property; (ii) a contract for services covered by the Service Contract Act, 41 U.S.C. § 6701 *et seq.*; (iii) a contract for concessions; or (iv) certain contracts entered into with the Federal Government in connection with Federal property or lands and related to offering certain services. 86 Fed. Reg. 50,986 § 5(a). The COVID-19 safety clause must specify compliance by the contractor or subcontractor with the Task Force's published guidance for workplace locations, provided that guidance is approved by the OMB Director. *Id.* at § 2(a).

The EO also directs the Federal Acquisition Regulatory Council ("FAR Council"), "to the extent permitted by law," to make corresponding amendments to the Federal Acquisition

Regulation ("FAR") providing for inclusion of the COVID-19 safety clause in future covered contracts. Because that amendment process takes time, the EO directs the FAR Council to issue interim guidance to federal agencies on how to incorporate the COVID-19 safety clause into covered contracts until the FAR Amendment takes effect. *Id.* § 3(a).

The EO, however, is targeted and has exceptions. Its mandate does not apply to grants, or to most contracts for procurement of goods (as opposed to services). *See id.* § 5(a)(i), (b)(i), (b)(v). Nor does its mandate apply to "contracts or subcontracts whose value is equal to or less than the simplified acquisition threshold" ("SAT"), essentially $250,000. *Id.* at § 5(a)(iii). *See also* 48 C.F.R. § 2.101. And, although "agencies are strongly encouraged, to the extent permitted by law, to ensure that the safety protocols required under [existing] contracts . . . are consistent with" the Task Force's guidance, the EO does not independently create the ability to force the COVID-19 safety clause into existing contracts.[2] *Id.* at § 6(c).

Pursuant to the EO, the Task Force issued guidance on September 24, 2021. Task

---

[2] At the November 16 hearing in this matter, counsel for Defendants said "that pre-existing contracts cannot be unilaterally modified by the government to include the vaccination mandate," and also that "[t]he only way the vaccination mandate can be included is if it involves either a new contract or a new solicitation regarding a contract or an extension or renewal of a contract or exercising an option on a contract or the government can, of course, request that the contract be modified to include the mandate and the vaccine requirements but it has to be a bilateral agreement." Tr. at 16. Defendants would like to clarify that agencies may also have independent contractual authority to unilaterally modify existing contracts. Such authority could include the ability to incorporate COVID-19 safety protocols into existing contracts and contracts outside of the categories identified in the EO (including contracts below the SAT). The Department of Energy ("DOE"), for example, has exercised its discretion to pursue amendments to include the COVID-19 safety clause requirements in its existing contracts pursuant to pre-existing, mutually agreed-upon contract terms that allow DOE to unilaterally modify certain requirements. *See infra* at 38–39.

Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors, https://perma.cc/H2MY-K8RT ("September Guidance"). Exercising the authority delegated to her by the President, the Acting OMB Director made the statutorily required determination that the Task Force Guidance[3] would promote "economy and efficiency" in federal contracting. *See* Determination of the Promotion of Economy and Efficiency in Federal Contracting Pursuant to Executive Order No. 14042, 86 FR 53,691, 53,691–92 (Sept. 28, 2021) ("September OMB Determination"). The Task Force Guidance concluded that covered contractor and subcontractor employees should be vaccinated against COVID-19, except insofar as any such employee was legally entitled to an accommodation. *See* September Guidance at 5–6. The Task Force Guidance also required covered contractor employees to be fully vaccinated by December 8, 2021. September Guidance at 5. The FAR Council then issued guidance on September 30, 2021, providing initial direction for the incorporation of the COVID-19 safety clause. Memo. from FAR Council to Chief Acquisition Officers, et al., re: Issuance of Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021), https://perma.cc/9BQ8-XBT6 [hereinafter "FAR Memo"]. It also provided a sample COVID-19 safety clause. Far Memo at 4.

   On November 4, 2021, the President announced the deadline for contractor employees to be fully vaccinated would be extended to January 18, 2022. White House, Fact Sheet: Biden Administration Announces Details of Two Major Vaccination Policies (Nov. 4, 2021),

_____

[3] Throughout, "Task Force Guidance" means the operative guidance at the time; so, for most of the discussion herein, it means the guidance in place as of November 10, 2021.

https://perma.cc/7FPV-PA2N (extending deadline to receive final vaccine shot to January 4, 2022). On November 10, 2021, the Task Force issued updated guidance, *see* Determination of the OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, and the Acting OMB Director issued a revised Determination ("November OMB Determination"). The November OMB Determination rescinded and superseded the prior Determination and formally confirmed the extension of the compliance date to January 18, 2022. The November OMB Determination also provided a detailed economic analysis of the Task Force Guidance's impact on the economy and efficiency of government contracting. *See* Determination of the OMB Director Regarding the Revised Safer Federal Workforce Task Force Guidance for Federal Contractors and the Revised Economy & Efficiency Analysis, *Id.* at 63418. The November OMB Determination, effective as of November 10, 2021, provides for a public comment period through December 16, 2021. *Id.*

The Task Force Guidance requires federal contractors who are party to a covered contract to "ensure that all covered contractor employees are fully vaccinated for COVID-19, unless the employee is legally entitled to an accommodation."[4] *Id.* at 63420. Covered contractor employees are "any full-time or part-time employee of a covered contractor working on or in connection with a covered contract or working at a covered contractor

---

[4] "[P]eople are considered fully vaccinated if they have received COVID-19 vaccines currently approved or authorized for emergency use by the FDA (Pfizer-BioNTech, Moderna, and Johnson & Johnson/Janssen COVID-19 vaccines) or COVID-19 vaccines that have been listed for emergency use by the World Health Organization (e.g., AstraZeneca/Oxford)." November OMB Determination, 86 FR 63419.

workplace." *Id.* at 63419. A covered contractor workplace is "a location controlled by a covered contractor at which any employee of a covered contractor working on or in connection with a covered contract is likely to be present during the period of performance for a covered contract." *Id.* After January 18, 2022, the date by which covered contractor employees must be fully vaccinated, covered contractor employees not subject to the requirement "must be fully vaccinated by the first day of the period of performance on a newly awarded covered contract, and by the first day of the period of performance on an exercised option or extended or renewed contract when the [COVID-19 safety] clause has been incorporated into the covered contract." *Id.* at 63420. Covered contractors oversee compliance with the Task Force Guidance. Covered contractor employers also may have legal obligations to provide accommodations to contractor employees "who communicate to the covered contractor that they are not vaccinated against COVID-19 because of a disability (which would include medical conditions) or because of a sincerely held religious belief, practice, or observance." *Id.*

### III.   This Lawsuit

Texas filed this lawsuit on October 29, 2021, but has not amended its Complaint to account for the November OMB Determination. *See* Compl., Dkt. 1. On November 15, 2021, Texas filed a motion for a temporary restraining order and a preliminary injunction. *See generally* Mot. at 6. The next day, the Court held a telephonic hearing on Texas's request for a temporary restraining order and, after hearing from the parties, converted Texas's request to one for a preliminary injunction. *See* Tr. Hrg. Nov. 16, 2021, at 28–29, Dkt. 18 [hereinafter "Tr."].

8

## STANDARD OF REVIEW

Preliminary injunctions are extraordinary remedies, *Cherokee Pump & Equipment, Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994), "not to be granted routinely, but only when the movant, by a clear showing, carries [the] burden of persuasion." *Black Fire Fighters Ass'n v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)). To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that a balance of equities tips in its favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (movant bears "the burden of persuasion" on all requirements). The movant's failure to demonstrate any of the factors is sufficient to deny injunctive relief, *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989), and "[t]he decision to grant a preliminary injunction is to be treated as the exception rather than the rule[,]" *Miss. Power & Light*, 760 F.2d at 621.

## ARGUMENT

### I.     Texas has failed to meet its burden to show standing for the broad relief that it seeks.

As the party seeking to invoke Article III jurisdiction, Texas bears the burden to demonstrate that jurisdiction is proper. Because "the Constitution extends the 'judicial power' of the United States only to 'cases' and 'controversies,'" *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102 (1998), this Court "cannot proceed at all" unless Texas establishes the "irreducible constitutional minimum of standing." *Id*; *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560 (1992). Texas half-heartedly attempts to meet its burden to show standing in three ways: it claims that EO 14042 improperly (i) interferes with Texas' ability to implement its own laws and exercise its traditional police power; (ii) compels certain of its citizens to obtain a COVID-19 vaccine against their will and/or their religious beliefs; and (iii) threatens economic harm in the form of "billions of dollars of [lost] federal contracts" and unemployment benefits and increased Medicaid expenses." Mot. at 5–11; 28–29. None of Texas's efforts succeed, and this Court thus lacks the authority to enter the "extraordinary and drastic" relief that Texas seeks. *Mazurek v. Armstrong*, 520 U.S. 960, 972 (1997).

*Sovereign Injury to Texas's Police Power.* Texas argues that the Task Force Guidance's vaccination requirement inflicts an "imminent, irreparable, sovereign injury," claiming it is the President's "clear intention" to supersede state policies, including Texas's Executive Order, GA-40. Mot. at 27–28. But Texas's real focus is not that its laws are preempted or its police power threatened, but that the EO harms a subset of its citizenry; namely, Texans who work for federal contractors who do not wish to receive the COVID-19 vaccine. To the extent Texas seeks to litigate on its citizens' behalf, it cannot do so. "A State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n.16 (1982). Whatever injuries Texas citizens may claim because they are employed by a contractor that profits from the Federal Government, the State of Texas is not in a position to bring suit on their behalf.[5]

---

[5] None of the cases cited by Texas implicate standing. All involve scenarios where a state sought to stay a lower court's injunction barring the state from enforcing a challenged

*Economic Injury.*  Texas claims that unless it "acquiesces" to EO 14042, it stands to lose over $7.32 billion in future contracts" and $7.3 billion in current contracts. Mot. at 5.[6] Because Texas's burden to demonstrate standing in the context of a preliminary injunction motion is "at least as great as the burden of resisting a summary judgment motion," *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (quoting *Lujan*, 497 U.S. at 907 n.8 (1990)), Texas cannot "rest on 'mere allegations,'" but rather "must 'set forth by affidavit or other evidence specific facts'" establishing standing. *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 878 (11th Cir. 2000) (quoting *Lujan*, 504 U.S. at 561).

While Texas does present several affidavits from individuals claiming that certain contracts are imperiled by EO 14042, the vast majority of the contracts discussed therein (on which Texas also relies to show imminent harm) are not subject to EO 14042's mandate, either because they predate the EO, or because they fall below the SAT—a dollar threshold below which the FAR's procurement and contracting requirements do not apply—and therefore are exempted from the EO's direct application. As to the contracts on which Texas relies that are outside the EO's mandate, Texas was asked to modify some of them to include a COVID-19 safety clause. Ex. A, Baughman Decl. ¶¶ 6–7; Ex. B., Liu Decl. ¶¶ 9–17; Ex. C, Summers Decl.

---

state law. *See, e.g.*, *Maryland v. King*, 567 U.S. 1301 (2012), *Abbott v. Perez*, 138 S. Ct. 2305 (2018); *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 409 (5th Cir. 2013).

[6] Texas appears to have attached a printout of a Government website in an effort to support its claim that it will lose in excess of $14 billion in current or future federal contracts/subcontracts. *See* Mot. at 5, n.19. Any harm that would flow from actions under those contracts and nexus to EO 14042 would depend on their specific terms and actions, information that Texas has wholly failed to provide (except arguably with respect to the few contracts addressed in its other supporting exhibits).

¶¶ 14–18; Ex. E, Jackson Decl. ¶ 7(c); Ex. F, Lopez Decl. ¶¶ 8–9. In some cases, Texas agreed; in most, it declined and contractual performance has continued, unchanged. *Id.*

In the final analysis, Texas has offered no evidence to show that any contract on which it relies has been modified unlawfully. Nor has Texas presented evidence that it will be denied a new contract or contract renewal absent its assent to the inclusion of a COVID-19 safety clause. The record evidence on which Texas relies does not show that Texas will suffer any injury, let alone one caused by EO 14042 and that would be remedied by a judicial determination enjoining the EO. Because Texas has failed to present any of the "triad of injury in fact, causation, and redressability," Texas has failed to carry its burden to show "the core of Article III's case-or-controversy requirement." *Steel Co.*, 523 U.S. at 103–04.[7]

## II.   Texas is not entitled to extraordinary injunctive relief.

Even if this Court finds that Texas has standing, it should nonetheless deny the request for preliminary injunctive relief because Texas does not satisfy any of the factors necessary for the Court to grant the extraordinary remedy sought.

### A.  Texas cannot succeed on the merits.

The Fifth Circuit considers "likelihood of success on the merits" to be "arguably the most important" factor when considering requests for preliminary relief. *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005). None of Texas's various theories establish a substantial likelihood of success.

---

[7] Even had Texas presented evidence of specific contracts that supported its assertion of economic harm, this Court would not have jurisdiction to adjudicate such claims. *See infra* at 39–40.

i.   *The President acted lawfully in issuing the EO.*

a.   *The EO has the required nexus to procurement economy and efficiency.*

The statute governing the President's Executive action as well as the consistent decisions of federal appellate courts for decades provide ample support for the lawfulness of the EO. The President issued the EO pursuant to the Federal Property and Administrative Services Act ("FPASA"), 40 U.S.C. § 101 *et seq.* 86 FR at 50985. FPASA's purpose is to "to provide the Federal Government with an economical and efficient system for . . . [p]rocuring and supplying property and nonpersonal services, and performing related functions including contracting." *Id.* § 101(a). That statute expressly empowers the President to "prescribe policies and directives that the President considers necessary to carry out [FPASA]," so long as those policies and directives are "consistent with [FPASA]." 40 U.S.C. § 121(1). This is a "particularly direct and broad-ranging authority over those larger administrative and management issues that involve the Government as a whole." *AFL-CIO v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979) (en banc); *see also Farkas v. Texas Instrument, Inc.,* 375 F.2d 629, 632 n. 1 (5th Cir. 1967) (noting "broad authority" granted to the President by FPASA).

A President lawfully exercises his FPASA authority when an executive order has "a 'sufficiently close nexus' to the values of providing the government an 'economical and efficient system for . . . procurement and supply.'" *UAW-Lab. Emp. & Training Corp. v. Chao*, 325 F.3d 360, 366 (D.C. Cir. 2003) (citation omitted). A President's policies must only be "reasonably related to [FPASA's] purpose of ensuring efficiency and economy in government procurement." *Liberty Mut. Ins. Co. v. Friedman*, 639 F.2d 164, 170 (4th

Cir. 1981). This is so because the statute uses terms that "are not narrow," and thus conveys "necessary flexibility" to the President. *Chao*, 325 F.3d at 366 (quoting *Kahn*, 618 F.2d at 789).

EO 14042 satisfies this "lenient" standard, *see Chao*, 325 F.3d at 367, as demonstrated by the rationale set forth in the order itself:

> This order promotes economy and efficiency in Federal procurement by ensuring that the parties that contract with the Federal Government provide adequate COVID-19 safeguards to their workers performing on or in connection with a Federal Government contract . . . . These safeguards will decrease the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government. Accordingly, ensuring that Federal contractors and subcontractors are adequately protected from COVID-19 will bolster economy and efficiency in Federal procurement.

EO 14042, § 1. The nexus is easy to discern: slowing COVID-19's spread promotes efficiency and economy because federal procurement—just as with businesses—suffers (and incurs higher costs) when people contracting with the Federal Government get sick and miss work.

The EO is concerned with protecting the Federal Government's financial and operational interests as a contracting party. Ensuring that its contractors do not suffer major disruptions from COVID-19 accomplishes just that. As the EO explains, COVID-19 is an airborne disease that spreads quickly, so in order to ensure that contractors do not spread COVID-19 to one another, all contractors working in a given physical workspace must be vaccinated. This is fully explained by the November OMB Determination's economy-and-efficiency rationale, which lays out that increased vaccinations will "decrease the spread of COVID-19, which will in turn decrease worker absence, save labor costs on net, and thereby improve efficiency in Federal contracting." 86 FR at 63421; *see also id.* at 63421–22. *See also infra*

14

at 27.

Texas argues that the standards set forth in the Task Force Guidance are "far too attenuated" from any conceptions of economy and efficiency. Mot. at 13–14. As an initial matter, courts have upheld Executive action even where the nexus to economy and efficiency "may seem attenuated." *See Chao*, 325 F.3d at 366 (discussing *Kahn*, 618 F.2d 784); *Nat'l Ass'n of Mfrs. v. Perez*, 103 F. Supp. 3d 7, 19–20 (D.D.C. 2015). Further, there is no such attenuation here: as recently as August 2021, unvaccinated persons had a 6.1-times greater risk of testing positive for COVID-19 infection than did persons who were fully vaccinated, and an 11.3-times greater risk of dying from COVID-19. CDC, Rates of COVID-19 Cases and Deaths by Vaccination Status (date posted Oct. 15, 2021), https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status. Other data indicates that, "[f]or all adults aged 18 years and older, the cumulative COVID-19-associated hospitalization rate was about 9 times higher in unvaccinated persons." CDC, Rates of laboratory-confirmed COVID-19 hospitalizations by vaccination status (dated posted November 18, 2021), https://covid.cdc.gov/covid-data-tracker/#covidnet-hospitalizations-vaccination. And with the highly transmissible Delta variant, contractors providing essential services to the Government could be crippled if a substantial number of their unvaccinated employees get sick. The connection between this state of affairs and the economy and efficiency of procurement and supply is not only reasonable, but fully explained in the November OMB Determination. *See infra* at 27. Notably, courts have upheld executive action under FPASA involving diverse policy agendas that, if anything, are far more attenuated than reducing the number of contractor employees who are

sick with COVID and, therefore, unable to provide services the government has contracted for—and is paying for. *See, e.g.*, *Kahn*, 618 F.2d at 790 (collecting cases for the proposition that FPASA has been "most prominent[ly]" used to impose "a series of anti-discrimination requirements for Government contractors"); *City of Albuquerque v. U.S. Dep't of Interior*, 379 F.3d 901 (10th Cir. 2004) (urban renewal); *Chao*, 325 F.3d 360 (rights of union members); *AFGE v. Carmen*, 669 F.2d 815 (D.C. Cir. 1981) (conservation of gasoline during an oil crisis); *Napolitano*, 648 F. Supp. at 729 (immigration status through e-Verify).

To be sure, FPASA does not give the President sweeping power to issue arbitrary decrees over the economy. But it is by no means limited to actions that serve no purpose other than to "ensure the efficient purchase of goods and services," as its use to impose anti-discrimination requirements clearly indicates. *Chao*, 325 F.3d at 366-67; *Kahn*, 618 F.2d at 790; *see also, Carmen*, 669 F.2d at 817–18 (executive order directing agencies to reduce subsidized parking for federal employees was permissible even where primary goal was "to reduce the waste of energy, particularly gasoline, in commuting to and from work"). While Texas may disagree with the President's policy or consider it unwise, the EO meets the requirement that the President consider the policy "necessary."[8]  40 U.S.C. § 121(a).

The same logic underpinning the EO's application to contractors applies with equal force to subcontractors. If subcontractors fall ill or infect others with COVID-19 while

---

[8] Texas also implies that the EO's stated rationale is "'pretextual.'" Mot. at 13 (quoting *BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Department of Labor*, --- F.4th ---,  No. 21-60845, 2021 WL 5279381 (5th Cir. Nov. 12, 2021)). The economy-and-efficiency explanation demonstrates that is not so, but Defendants also address Texas's argument regarding pretextuality later. *See infra* at 21–22.

working on a federal contract, their illness and related absenteeism increases the Federal Government's costs. *Cf. Chao*, 325 F.2d at 362 (affirming FPASA use to issue Executive Order applying to subcontractors). By contrast, the EO does not apply to subcontractors not working on a federal contract or at a federal workplace, underscoring the direct nexus between the EO and the government's economy-and-efficiency interests. Thus, the case Texas relies on to challenge the EO's application to subcontractors—*Liberty Mutual*, Mot. at 14—is far afield, as *there* the connection to federal operations was unclear. 639 F.3d at 166 (involving a contractual requirement on a subcontractor who "had[] not written any insurance policies for any federal agency"). Here, the Acting OMB Director made factual findings about how applying the Task Force Guidelines to government subcontractors would promote economy and efficiency. November OMB Determination, 86 FR at 634421–23. "By contrast, no such findings" were made in *Liberty Mutual* about whether applying the challenged EO to subcontractors would promote efficiency and economy. 639 F.2d at 171.

Moreover, despite Texas's claims of "overwhelming evidence of the negative consequences" of the EO, Mot. at 14–15 (emphasis omitted) (citing Exs. M-Q, Dkt. 6-1, https://perma.cc/9GUT-9UT7), no evidence suggests any "economic disruption" will occur. For example, Texas fails to offer any proof that either of the two employers identified in the cited evidence have contracts with the Federal Government within the EO's scope. *See* Mot. Exs. M-Q. Further, while Texas raises alarm about a potential increase in unemployment benefits, a number of factors Texas has left completely unaddressed—including whether employees subject to the EO have sought accommodation requests—impact the existence of

any harm. The Court should not rely on Texas's parade of horribles.[9]

In short, Texas jumps from identifying individuals who have been told to vaccinate by their employers (and who object to vaccination) to immediately assuming economic peril for the state. That cannot meet Texas's burden for injunctive relief, and certainly does not establish negative effects caused by the EO. And, even if Texas had shown some negative effects from the EO, courts have upheld FPASA actions even when a plaintiff could plausibly argue that the challenged action will have "opposite effects or no effects" on efficiency or economy. *Chao*, 325 F.3d at 366–67; *see also Kahn*, 618 F.2d at 792–93 (affirming action taken under FPASA though it might in fact increase procurement costs). For all of these reasons, Texas has failed to demonstrate the President exceeded his authority in issuing the EO.

### b. The President has authority to direct government procurement policy.

Although Texas would have the Court believe that the EO's intention is to create "major economic and social" change, Mot. at 17, the use of FPASA here is entirely consistent with its prior (deemed valid) deployments. Since the 1960s, federal appellate courts have routinely acknowledged that FPASA permits the President to manage government contracting

---

[9] In the interest of length, Defendants do not highlight all of Texas's failings of proof here. At most, though, all Texas shows is that four residents of Texas working at two separate companies have been asked by their employers to vaccinate; all four residents have religious objections to becoming vaccinated, but only two (working at only one of the identified employers) are known to have sought accommodation (the result of those requests is not offered); the consequence of not vaccinating at one of the employers is termination (the consequence at the other is not offered); replacing these and similar personnel at those employers purportedly involves complicated dynamics; and Texas offers unemployment benefits.

through executive orders. *See, e.g.*, *Farkas*, 375 F.2d at 632 n.1 ("We would be hesitant to say that the antidiscrimination provisions of Executive Order 10,925 are so unrelated to the establishment of 'an economical and efficient system for . . . the procurement and supply' of property and services . . . that the order should be treated as issued without statutory authority."); *Farmer v. Phila. Elec. Co.*, 329 F.2d 3, 7 (3d Cir. 1964); *see also Napolitano*, 648 F.Supp.2d at 730, 737–738; EO 12072, 43 FR 36869 (Aug. 16, 1978); EO 13465, 73 FR 33285 (June 11, 2008); EO 13950, 85 FR 60683 (Sept. 28, 2020).

Though Texas challenges that the EO is a "brazen assumption of power that violates the Major Questions doctrine," Mot. at 17, Congress has long understood and accepted that FPASA granted broad authority to the President. "Past [Presidential] practice does not, by itself, create power, but 'long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the [action] had been [taken] in pursuance of its consent.'" *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981). While Congress has revised FPASA since 1949, including a complete recodification in 2002, none of those amendments modified or restricted the power used by the President here (or checked the President as to prior deployments).[10] "If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576

---

[10] *See, e.g.*, Pub. L. No. 99-500, §101(m) [title VIII, §832], 100 Stat. 1783-345 (1986); Pub. L. No. 99-591, §101(m) [title VIII, §832], 100 Stat. 3341-45 (1986); Pub. L. No. 104-208 § 101(f) [Title VI, § 611], 110 Stat. 3009-355 (1996); Pub. L. No. 107-217, 116 Stat. 1062, 1068 (2002).

U.S. 519, 536–37 (2015) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)). In contrast, the position taken by Texas ignores more than half-a-century of precedent from all three branches of our constitutional system. The President has clear authority to act as he did.

Texas argues that the FAR Council's statutory responsibility under the Office of Federal Procurement Policy Act ("OFFP Act"), 41 U.S.C. § 1101 *et seq.*, to "issue and maintain . . . a single Government-wide procurement regulation" means the FAR Council has the *exclusive* authority to issue procurement regulations.[11] Mot. at 16–17 (citing 41 U.S.C. § 1303(a)(1)). But there is nothing in the text of the cited language stating, or even implying, that the FAR Council's authority to issue regulations regarding procurement is *exclusive*. Indeed, the OFPP Act also permits agencies to prescribe "regulations essential to implement Government-wide policies and procedures,"41 U.S.C. § 1303(a)(1)(A), which cannot be reconciled with Texas's reading.

Nor is the President's directive to amend the FAR to provide for the COVID-19 safety clause's inclusion a usurpation of the FAR Council's right to prescribe regulations; the President has in no way prescribed the amendments himself, and has usurped no authority whatsoever. Further, the EO acknowledges that the President's directions regarding procurement regulations and guidance are made only "to the extent permitted by law." EO

---

[11] Under the OFFP Act, 41 U.S.C. § 1101 *et seq.*, the FAR Council "assist[s] in the direction and coordination of Government-wide procurement policy and Government-wide procurement regulatory activities in the Federal Government." *Id.* § 1302(a). That includes issuing and maintaining the FAR, an over 2,000-page regulation for procurement policy. *Id.* § 1303(a).

14042 § 3.

At any rate, all of that is still to come: the FAR Council has not yet amended the FAR, *see* Open FAR Cases as of November 1, 2021 at 2, https://perma.cc/G9G3-6TZA (indicating that on September 29, 2021, the FAR Council opened a case to implement EO 14042 by drafting a proposed rule). All that has occurred to date is that the FAR Council issued "initial direction for the incorporation of [the COVID-19 safety] clause into . . . solicitations and contracts" to ensure consistency across federal contracting at large (thus serving efficiency purposes) until the FAR is amended. *See* FAR Memo. FPASA permits this, since 40 U.S.C. § 121(a) authorizes the President to "prescribe policies and directives" necessary to provide the Federal Government with an economical and efficient system for procurement and supply, "and performing related functions including contracting." *Id.* §§ 101(1), 121(a).

### c. *BST is inapposite to the issues here.*

Texas repeatedly cites to *BST,* 2021 WL 5279381,[12] but that case is irrelevant here.  The OSHA requirement at issue in *BST* involves a different statute, concerns different Constitutional authority, implicates different federal agency defendants, centers on a different type of Executive action, and impacts an entirely different (though overlapping) set of

---

[12] *BST* involved a challenge by "a diverse group of petitioners" to an Emergency Temporary Standard ("ETS") issued by the Occupational Safety and Health Administration ("OSHA") providing private employers with more than 100 employees the option to require employees to vaccinate for COVID-19 or undergo weekly COVID-19 tests and wear masks. 2021 WL 5279381, at *1. *See also* 86 FR 61402. OSHA issues ETSs pursuant to the Occupational Safety and Health Act ("OSH Act"), 29 U.S.C. § 651 *et seq.*, and pursuant to Executive Branch authorities derivative of the Commerce Clause, *BST*, 2021 WL 5279381, at *3, 7. Neither the OSH Act nor the Commerce Clause are at issue in this case.

employers. *Compare id. with* EO 14042 *and* Protecting the Federal Workforce and Requiring Mask-Wearing, Exec. Order No. 13,991 (EO 13,991), 86 FR 7045, § 4(a) (Jan. 20, 2021) (establishing the Task Force). At bottom, unlike in *BST*, EO 14042 concerns the Executive Branch's role as a player in the commercial marketplace: federal agencies, just like other contracting parties, can elect to contract with others on terms of their own choosing. "It has long been recognized that the government, like private individuals and businesses, has the power 'to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases.'" *Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696 (5th Cir. 1973) (quoting *Perkins v. Lukens Steel Co.*, *310 U.S. 113, 127 (1940)*); *see also Kahn*, 618 F.2d at 794 ("Those wishing to do business with the Government must meet the Government's terms; others need not"). The Executive Branch's right to contract, and its relationship to those with whom it contracts, places the issues here on vastly different footing from the *BST* test-or-vaccine requirement, where there was no direct commercial exchange with the government. *See BST*, 2021 WL 5279381, at *7 (charging that the vaccine requirement "commandeers U.S. employers").

Further, while OSHA issues emergency standards rarely, Presidential directives under FPASA are frequently issued and frequently upheld. This makes sense, given that the OSH Act empowers OSHA to issue emergency standards only in the rare circumstance where it finds that doing so is "necessary to protect employees" from a "grave danger" in the workplace. 29 U.S.C. § 655(c). That stands in marked contrast to the "necessary flexibility

and 'broad-ranging authority'" Congress gave the President in FPASA. *Chao*, 325 F.3d at 366

(quoting *Kahn*, 618 F.2d at 789).

> ii. *Texas is not likely to succeed on its Administrative Procedure Act ("APA") Challenges to the OMB Determination or the FAR Memo.*
>
> a. *Texas's challenges to the September OMB Determination are moot and not justiciable.*

The November OMB Determination, which replaces the September OMB

Determination, renders Texas's challenges to the first one moot. The November OMB

Determination expressly "rescinds and supersedes [the] prior notice." 86 FR at 63418. It

contains substantive changes, including a new date by which contractors must comply with

the EO's vaccination requirements. Texas has nonetheless chosen to challenge the prior

Determination, even though it is a "well-settled principle of law" that "when an agency has

rescinded and replaced a challenged regulation, litigation over the legality of the original

regulation becomes moot." *Akiachak Native Community v. U.S. Dep't of Interior*, 827 F.3d 100,

113 (D.C. Cir. 2016); *see also Princeton Univ. v. Schmid*, 455 U.S. 100, 102–03 (1982) (holding that

"substantially amend[ing]" regulations even after litigation has commenced suffices to moot

claims); *Sannon v. United States*, 631 F.2d 1247, 1250 (5th Cir. 1980) ("That newly promulgated

regulations immediately applicable to litigants in a given case can have the effect of mooting

what once was a viable case is without doubt.").

In any event, the APA does not apply to either OMB Determination because the Acting

OMB Director promulgated the rules pursuant to delegated presidential authority.

"Presidential action is not subject to judicial review under [the APA]." *Nat'l Res. Def. Council,*

*Inc. v. U.S. Dep't of State*, 658 F. Supp. 2d 105, 109 (D.D.C. 2009) (citing *Franklin v. Massachusetts*,

505 U.S. 788, 800–01 (1992); *Dalton v. Specter*, 511 U.S. 462, 470 (1994)). The EO delegated to the OMB Director the President's existing authority to determine whether the Task Force Guidance "will promote economy and efficiency in Federal contracting." *See* EO 14042, § 2(c). It did so pursuant to 3 U.S.C. § 301, which authorizes the President "to designate and empower the head of any department or agency in the executive branch, . . . to perform without approval, ratification, or other action by the President [] any function which is vested in the President by law," including the President's power to direct government contracting under FPASA. When exercising delegated authority, the official "stands in the President's shoes" and "cannot be subject to judicial review under the APA." *NRDC*, 658 F. Supp. 2d at 109 & n.5, 111; *see also Tulare Cnty.. v. Bush*, 185 F. Supp. 2d 18, 28–29 (D.D.C. 2001), *aff'd*, 306 F.3d 1138 (D.C. Cir. 2002); *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016).

*Chamber of Commerce. of the United States v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), is not to the contrary. There, the plaintiffs did not bring APA claims, so the court limited its analysis to whether plaintiff could rely on non-statutory causes of action to challenge an executive order. *See id.* at 1327. To be sure, *Reich* held that plaintiffs had other, non-statutory avenues to review executive action—and Texas can do just that to challenge the EO as a violation of FPASA. But that has no bearing on whether Texas can use the APA to make that challenge, and for the reasons stated, it cannot.

### b. Texas's challenges to the FAR Memo are not justiciable, and even so, the FAR Memo falls within the FAR Council's authority.

The FAR Memo is also not subject to judicial review under the APA. The APA

provides review only of final agency action—*i.e.*, a decision (1) that marks the "consummation of the agency's decisionmaking process" and (2) by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Neither prong is met here.

First, the FAR Memo is not final agency action because it is not the FAR Council's final word on the COVID-19 safety clause. This guidance was issued in accordance with the EO's instructions for the FAR Council to "take *initial* steps to implement" the contract clause described in the EO.  EO 14042 § 3(a) (emphasis added). The FAR Memo suggests a COVID-19 safety clause for contracting officers to use in the interim, subject to agency- and contract-specific deviations to be developed by each agency. FAR Memo at 4–5. The conclusion of the policymaking process set forth in the EO—the FAR Council's amendment to the FAR to complete the implementation of the EO by providing the contract clause "for inclusion in Federal procurement solicitation and contracts" subject to the EO—has yet to occur. EO 14042 § 3(a); *see also* Open FAR Cases as of November 1, 2021 at 2, https://perma.cc/G9G3-6TZA (indicating that on September 29, 2021, the FAR Council opened a case to implement EO 14042 by drafting a proposed rule).

Second, agencies can implement the EO without the FAR Memo, so it is not a decision from which "legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (citation omitted). Plaintiffs cannot challenge guidance when they fail to show "any risk of future harm traceable to the . . .  Guidance itself, as opposed to the preexisting federal laws it describes." *Klayman v. President of the U.S.*, 689 F. App'x 921, 924 (11th Cir. 2017).  The language of the FAR Memo

makes clear that the legal consequences here emanate from the EO, rather than the non-binding FAR guidance. As the memo explains, the FAR Council developed the suggested COVID-19 safety clause "pursuant to section 3(a) of the executive order" and to "support agencies in meeting the applicability requirements and deadlines set forth in the order," FAR Memo at 2, not because of any independent legal obligation imposed by the Council.

Even if the FAR Memo was final agency action, Texas fails to challenge any specific aspect in which the FAR Council exceeded its statutory authority. The FAR Memo simply carries out the EO directive to "take initial steps to implement appropriate policy direction" for how agency acquisition offices can use the COVID-19 safety clause described in the EO. EO 14042 § 3(a). Texas claims that the FAR Memo improperly reveals the goal to "get[] more people vaccinated." Mot. at 24 (quoting FAR Memo at 3), but it is difficult to see what is problematic about this intention, which dovetails with the EO's goal of "decreas[ing] the spread of COVID-19, which will decrease worker absence, reduce labor costs, and improve the efficiency of contractors and subcontractors at sites where they are performing work for the Federal Government." EO 14042 § 1. And, as explained above, *see supra* Part II.A.i., these goals fall well within the President's authority under FPASA. For similar reasons, Administrator Carnahan, Secretary Nelson and Administrator Austin were properly exercising their authority in issuing nonbinding guidance to help contractors incorporate the COVID-19 safety clause. Accordingly, Texas's challenges to the FAR Memo fall short.

### c. *Neither the November OMB Determination nor the FAR Memo are arbitrary and capricious.*

Even if the November OMB Determination and the FAR Memo were subject to the

APA, the arbitrary-and-capricious claims would still fail because the Determination provides "a rational connection between the facts found and the choice made." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404–05 (D.C. Cir. 1995) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Arbitrary and capricious review is a "deferential standard" under which an agency action must only satisfy "minimum standards of rationality." *La. Env't Action Network v. U.S. EPA*, 382 F.3d 575, 582 (5th Cir. 2004). A court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).

The November OMB Determination is eminently reasonable. OMB approved the revised Task Force Guidance because it concluded that "[t]he safety protocols that are set forth" in the guidance "are meant to ensure that COVID-19 does not easily spread within the workplace, so that Federal contractor employees can continue to be productive." 86 FR at 63,423. The requirement promotes economy and efficiency in federal contracting because decreasing worker absences lowers costs. As OMB explains, "[r]educing the number of infected people mechanically reduces transmission," and "evidence also indicates that vaccines also reduce transmission by people who contract 'breakthrough' infections." *Id.* at 63,422. In conjunction with the other safety protocols proposed in the Task Force Guidance, the vaccine requirements will "prevent infection and illness and preserve the productivity" of federal contractors. *Id.* OMB also weighed concerns about employee retention, explaining that data from private companies led it to conclude that "few employees [will] quit because of the

vaccine mandate" and "even if some non-negligible number of workers were to quit rather than comply with a vaccine mandate," the short-term cost of replacing those workers is outweighed by "long-lasting" benefits of vaccination. 86 FR at 63422.

Texas claims that the November OMB Determination and FAR Memo did not properly consider costs to the States. Mot. at 22. But the November OMB Determination makes clear that it did consider the costs to covered contractors, including Texas, and determined that "[b]ecause vaccines are widely available for free, the cost of implementing a vaccine mandate is largely limited to administrative costs associated with distributing information about the mandate and tracking employees' vaccination status. Such costs are likely to be small." 86 FR at 63422. As for "reliance interests," Texas fails to articulate any real harm from their "reliance" on the lack of a contractor vaccine requirement when enacting state laws. Additionally, the EO does not create new rights to alter existing contracts, helping to protect Texas's reliance interests on the contracts it already has in place. OMB was entitled to approve guidance to manage federal operations and contracts on the basis of the data it considered, notwithstanding the presence of state and local measures that would be preempted for federal contracting purposes.

Texas also argues that the November OMB Determination was pretextual and a "trojan horse for regulation of public health." Mot. at 23. But Texas fails to establish that the November OMB Determination and attendant explanation "is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575–76 (2019). As OMB reasonably concluded, slowing the spread of

COVID-19 has an economically beneficial impact on federal operations, since federal contractors incur significant labor costs when workers fall sick from COVID-19 and spread it to others in the workplace. *See* 86 FR at 63421–23. While imposing such a contractual requirement may also have public health effects, that result does not undermine the reasoning or legitimacy of the Acting OMB Director's determination. A Presidential exercise of FPASA authority does not "become[] illegitimate if, in design and operation, the President's prescription, in addition to promoting economy and efficiency, serves other, not impermissible, ends as well." *Carmen*, 669 F.2d at 821; *see also id.* (collecting cases).

Nor can Texas succeed in complaining that the November OMB Determination contains post hoc rationalizations. *See* Mot. at 22. No principle of law prevents the Executive Branch from "'deal[ing] with [a] problem afresh' by taking new agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907–08 (2020) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)). The Acting OMB Director took that route here: rather than merely providing a fuller explanation of her prior Determination, the November OMB Determination "rescinds and supersedes [her] prior notice." 86 FR at 63418. And the Acting OMB Director set a new date for contractor compliance, further underscoring the superseding nature of her action. An entirely new agency action does not equate to mere "litigation affidavits." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971). And although the Acting OMB Director ultimately reached the same efficiency-and-economy conclusion, she properly rested that new conclusion on evidence and justifications. *See Regents*, 140 S. Ct. at 1908 ("An agency taking [the new-agency-action] route is not limited to its prior reasons.").

The November OMB Determination simply provides information about "the grounds that the agency invoked when it took the action." *Id.* at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). In sum, neither the November OMB Determination nor the FAR Memo are arbitrary and capricious.

### iii.   *Texas's 41 U.S.C. § 1707 claims are not likely to succeed.*

Texas faults the Task Force Guidance, the Initial Determination, and the FAR Memo for not complying with the notice-and-comment requirements of 41 U.S.C. § 1707. None of these claims have merit.

### a.  *Texas's challenges to the OMB Determination are moot, and in any event, the November OMB Determination readily complies with 41 U.S.C. § 1707.*

As explained, *see supra* at 22–24, Texas's challenges to the September OMB Determination under 41 U.S.C. § 1707 are also moot.  Even setting mootness aside, Texas's claim against the September OMB Determination is not justiciable: Section 1707 does not apply to exercises of Presidential authority like the EO and the OMB Director's Determinations. Section 1707 applies only to an "executive agency," a defined term in the statute. 41 U.S.C. § 133. That statutory definition does not include the President. *See id.* Because the President is not an agency under the statute, and because the OMB Director acted pursuant to a delegation from the President, § 1707's procedural requirements do not apply to either EO 14042 or to the OMB Director's Determinations. *See* EO 14042 § 3(a). *See NRDC*, 658 F. Supp. 2d at 109 & n.5, 111; *supra* at 23–24.

To the extent Texas challenges the November OMB Determination, that also fails for the additional reason that the Determination invokes § 1707(d)'s waiver for "urgent and

compelling circumstances." Those circumstances exist because, among other reasons, "[t]he pandemic continues to present an imminent threat to the health and safety of the American people." 86 Fed. Reg. at 63423–24. As explained in her new economy-and-efficiency determination, the Acting OMB Director concluded that notice-and-comment would be impracticable here, not least because delay "would result in harm." *Id.* at 6342—25. She also properly designated her determination as "temporary" and noted she is "soliciting comment on all subjects of this determination," consistent with her obligations under § 1707(e). *Id.*

### b. The FAR Memo and Task Force Guidance are not "policies" subject to 41 U.S.C. § 1707.

Section 1707's procedural notice requirements also do not apply to the FAR Memo or the Task Force Guidance because they are, at most, nonbinding guidance, not "policies." The FAR Council issued the memo to develop a template COVID-19 safety clause "to support agencies in meeting the applicability requirements and deadlines set forth in [EO 14042]" and to "encourage[]" agencies to "exercise their authority" to temporarily deviate from the FAR by including similar clauses in their procurement contracts. FAR Memo at 2–3. The FAR Memo does not direct an agency to take any specific action, but instead encourages contracting officers to "follow the direction[s] … issued by their respective agencies" for how to utilize the memo's guidance. *Id.*[13] The FAR Memo suggests a sample COVID-19 safety clause that

_____

[13] For similar reasons, Texas's claim that the FAR Memo amounted to a "significant revision" to the FAR requiring notice and comment also fails. *See* Mot. at 19. The memo does not revise the FAR; rather, it provides agencies with "initial direction for the incorporation of a clause into their solicitations and contracts to implement guidance" from the Task Force. FAR Memo at 1. Texas cites no authority indicating that 48 C.F.R. § 1.501-2 would apply to initial guidance.

contractors can implement in order to comply with their obligations under the EO, but contractors need not adopt this precise clause. *See Texas v. Equal Employment Opportunity Commission*, 933 F.3d 433, 441 (5th Cir. 2019) *as revised* (Nov. 25, 2015), *aff'd by equally divided court*, 136 S. Ct. 2271 (2016) ("Courts have looked for mandatory language to determine whether an agency's action binds it and accordingly gives rise to legal consequences.") The FAR Memo has no independent effect and none of its guidance is operational unless an agency chooses to incorporate it into a procurement contract.

Likewise, the Task Force Guidance has no legal consequences without approval by the OMB Director. *See* Task Force Guidance at 1. In the absence of OMB action, the Task Force Guidance would have no independent effect at all, let alone a "significant effect beyond the internal operating procedures" of the issuing agency. *See* 41 U.S.C. § 1707. Similarly, in the APA context, agency action is no more than nonbinding guidance when it does not "impose[] any rights and obligations" on the parties. *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015). Because neither the FAR Memo nor the Task Force Guidance have independent legal effect, invalidating either would have no resulting impact, because contractors would still be required to comply with the Executive Order. Accordingly, they are nonbinding guidance, and Texas cannot succeed on its § 1707 claims.

### iv.   *Plaintiffs' Constitutional claims are meritless.*

#### a.   *The challenged actions do not violate the nondelegation doctrine.*

FPASA's delegation of authority to the President fits comfortably within the bounds of constitutionally permissible delegations. Congress may lawfully delegate decision-making

authority so long as it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (citation omitted). Under this standard, a delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority." *Id.* at 372–73 (citation omitted).

FPASA contains a clearly defined intelligible principle that falls well within lawful bounds. It sets forth a general policy—the promotion of economy and efficiency in the Federal Government's procurement of property and services, *see* 40 U.S.C. § 101—and authorizes the President to issue orders designed to further those specific statutory goals in that narrow, definable context, *see id.* § 121(a). It is unsurprising that Texas identifies no case holding that FPASA violates the exceedingly deferential nondelegation doctrine—every court to consider the question has held that the Congressional grant of contracting authority to the President passes constitutional muster. *See City of Albuquerque*, 379 F.3d at 914; *Kahn*, 618 F.2d at 793 n.51. Texas largely reiterates its statutory objections—protesting that the statute is "so broad," Mot. at 25—but "Congress does not violate the Constitution merely because it legislates in broad terms." *Touby v. United States*, 500 U.S. 160, 165 (1991).

Texas also argues that the President violated 3 U.S.C. § 301 when he delegated his authority to members of the Task Force who were not Senate confirmed. Mot. at 26 n.64. But the EO only *directs* the Task Force to amend the FAR to comply with its terms—it does not purport to *delegate* Presidential authority to the Task Force. *See* EO 14042 § 2(b). The text of the EO makes this clear: it states that the OMB Director shall act "as an exercise of the

33

delegation of my authority under the Federal Property and Administrative Services Act, *see* 3 U.S.C.  301," *id.* § 2(c), but does not invoke that statutory provision when referencing the FAR Council, *see id.* § 3(a). The EO's directive to the FAR Council does not violate 3 U.S.C. § 301 because it does not implicate this statute.

### b.  The challenged actions do not violate the Spending Clause.

Texas further claims that EO 14042 violates the Spending Clause because only Congress has the ability to appropriate funds. Relying on *City & County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), Texas argues the President "has no spending power of his own." Mot. at 26. But *Trump* involved the President's attempt to apply conditions to Federal grants when Congress "ha[d] not delegated [the] authority to the Executive to condition new grants on compliance" with those terms. *Trump*, 897 F.3d at 1233. Here, FPASA specifically delegates authority to the President to impose "policies and directives" necessary to manage federal contracting. *See* 40 U.S.C. § 121(a).

Texas also argues that EO 14042 and its implementing guidance exceed a limitation imposed on the Federal Government's spending power, Mot. at 26—namely, that if Congress "intends to impose a condition on the grant of federal moneys, it must do so unambiguously" so "States [can] exercise their choice knowingly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *see also Dole*, 483 U.S. at 206–07. This limitation on Congress's authority to condition grants of federal funding does not apply to federal contracts, nor has any court ever so held. "[T]he consequences of imprecision" in spending legislation "are not constitutionally severe" when the Federal Government "is acting as patron rather than as sovereign." *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998).

34

At any rate, EO 14042 and its implementing guidance unambiguously put contractors on notice that compliance with OMB-approved Task Force Guidance is an obligation under a covered contract. EO 14042 ensures that "the *existence* of the condition itself" will be "explicitly obvious" to federal contractors by directing agencies to incorporate (to the extent permitted by law) a COVID-19 safety clause into a procurement contract before obligating a contractor's compliance. *See Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (emphasis added) (citation omitted). A state agency or subdivision will be capable of making "an informed," voluntary decision whether to accept the attendant obligations of contracting with the Federal Government. *See Pennhurst*, 451 U.S. at 25.

Furthermore, Texas stakes its entire claim on the fact that agencies are encouraged under the FAR Memo to include a provision requiring compliance with "guidance conveyed through Frequently Asked Questions," which may be amended during the period of performance. *See* Mot. at 27. But the Supreme Court has not required exactitude when conditioning federal funding. *See, e.g.*, *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985). Indeed, "the Supreme Court has held that conditions may be 'largely indeterminate,'" and yet constitutionally permissible, as long as the States have clear notice that accepting funds "obligate[s] them to comply with [the conditions]." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (quoting *Pennhurst*, 451 U.S. at 24–25). Federal contractors are capable of making informed, voluntary decisions to accept an obligation to comply with periodically updated guidelines. *See Ky., Dep't of Human Res. v. Donovan*, 704 F.2d 288, 299 (6th Cir. 1983). The challenged condition thus satisfies *Dole* and *Pennhurst*.

**B.  Texas does not face irreparable harm.**

Texas must show that, in the absence of an injunction, it is "likely to suffer irreparable harm[;]" *i.e.*, harm for which there is no adequate remedy at law. *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013) (citation omitted). That showing must demonstrate that irreparable harm is *likely*, not merely possible, *Winter*, 555 U.S. at 20; "[s]peculative injury is not sufficient" to make a clear showing of irreparable harm," *Holland Am. Ins.*, 777 F.2d at 997. Moreover, "the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (citing *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985). Texas has not carried its burden here.

As noted, in order to promote the safe and effective performance of federal contracts in the midst of a global health emergency, EO 14042 sets the terms on which the Federal Government will enter contracts. "Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases." *Perkins*, 310 U.S. at 127. In an effort to dictate the very thing that the Supreme Court has said cannot be "restricted," Texas frames its injury in terms of its sovereign prerogative to set state policy. Mot at 28 (citing cases). But nothing in EO 14042 purports to "prevent [Texas] from enforcing its laws"; it directs federal-contracting policy. Inasmuch as Texas disagrees with EO 14042, it is free to decline to deal with the United States as a contractual counterparty. What it is not free to do, and what Texas seeks to do in this case, is to compel the United States to contract with Texas (and even with private parties) on terms of Texas's choosing. "Those

wishing to do business with the Government must meet the Government's terms; others need not." *Kahn*, 618 F.2d at 794. If Texas is correct, and this articulation of harm is sufficient to demonstrate the requisite irreparable injury, then any state could effectively superintend federal policy contracting decisions by framing their injury as Texas has. Moreover, to the extent that states had opposing policy views, any federal policy under this theory would inherently cause irreparable harm sufficient to warrant emergency relief.

Texas also argues that if EO 14042 is not enjoined, "[p]rograms that provide vital services to both Texas and the nation could be eliminated" with "potentially devastating" consequences. Mot. at 28. But EO 14042 is not self-executing; COVID-19 safety protocols do not become a requirement until they are incorporated into a given contract, through modification of an existing contract or through the inclusion of a provision as part of the solicitation for a new contract or the extension, renewal, or exercise of an option on an existing contract. To meet its burden to show "imminent" harm, Texas must demonstrate that the United States (i) has improperly modified or terminated an existing contract because that contract did not contain a COVID-19 safety clause; or (ii) has indicated that for a contract expiring soon, or for a contract to be awarded imminently, renewal/award would be contingent on incorporation of a COVID-19 safety clause.[14] *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975).

---

[14] Consistent with the EO, the Task Force Guidance set forth a phase-in period for the new requirements to be added to federal contracts, generally keyed to new contracts awarded on or after November 14 and any changes to existing contracts made on or after October 15. *See* September Guidance at 12.

Although Texas points to various existing federal contracts to which it or its subagencies are a party, *see* Mot. at 5–6, many of them are not proven to be subject to EO 14042.  As noted, the mandatory provisions of EO 14042 expressly does not apply to "contracts or subcontracts whose value is equal to or less than the SAT," EO 14042 § 5(b)(iii), including numerous contracts on which Texas relies. *See*; Ex. B, Liu Decl. ¶¶ 11–12 (USDA lease); Ex. C, Summers Decl. ¶¶ 9–10 (GSA permits); Ex. D, Westlake Decl. ¶¶ 36–37 (NTESS contracts); Ex. E, Jackson Declaration ¶ 7 (NASA contracts); Ex. F, Lopez Decl. ¶¶ 7–8 (CDC contracts).

Almost all of the contracts that Texas identifies predate EO 14042 and therefore are excluded from the express scope of its mandate. *See supra* note 6; *see also* Dkt. 6-1, Ex. H, & Ex. E, Jackson Decl. ¶ 7 (NASA contracts); Dkt. 6-1, Ex. I & Ex. A, Baughman Decl. ¶ 6 (NCI/NIU contracts); Dkt. 6-1, Ex. G, ¶ 12 & Ex. B, Liu Decl. ¶ 13 (USDA lease); Dkt. 6-1, Ex. J & Ex. C, Summers Decl. ¶¶ 13-18 (GSA permits). Even though it was not required to modify the contract by EO 14042, the United States did in several cases seek a bilateral modification of several contracts that predate the EO. *See* Ex. B, Liu Decl. ¶¶ 13, 17; Ex. C, Jackson Decl. ¶ 7; *accord* Dkt. 6-1, Ex. J, ¶¶ 9, 12–13 (noting various bilateral modification requests); Ex. F, Lopez Decl. ¶ 9 (bilateral modification requests withdrawn). Other than a bilateral modification request to which Texas assented, *see* Ex. E, Jackson Decl. ¶ 7(c) (NASA-UT-Dallas contract), there is no proof of Texas agreeing to any bilateral modification requests to date, and the pertinent contracts remain in force. Texas therefore cannot show that it has been harmed at all, let alone irreparably so, with respect to these contracts.

Of existing contracts, this leaves Texas Tech University's ("TTU") contract with National Technology and Engineering Solutions of Sandia, LLC ("NTESS"). NTESS, a private corporation, contracts with the National Nuclear Security Administration ("NNSA") to operate Sandia National Lab ("Sandia"), a nuclear energy facility. Ex. D, Westlake Decl. ¶ 4. NTESS, in turn, subcontracts with TTU for various tasks that intersect with operation of the lab. *Id.* ¶ 31.

NNSA's contract with NTESS includes a clause providing that NNSA may, "from time to time and at any time, unilaterally modify the Contract to revise, add or delete" certain clauses. *Id.* ¶ 12. Unilateral modifications "regularly occur, as these contracts are used to fill need of a long-term or continuing nature." *Id.* The contract has "unique flexibility to quickly respond to and fulfill various national security priorities and needs." *Id.* ¶ 13. Even though this is an existing contract, on October 14, 2021, NNSA unilaterally modified its contract with NTESS to include the COVID-19 safety clause. *Id.* ¶ 28. That inclusion makes good sense here: Sandia is a "national security" laboratory that's part of the "nuclear security enterprise." *Id.* ¶ 5. Sandia works in sensitive areas critical to the nation's security, including "maintaining the stockpile, nonproliferation, counterterrorism and counterproliferation, and powering the nuclear navy." *Id.* ¶ 10.

The contract between NNSA and NTESS required NTESS to "flow down" that the COVID-19 safety clause to its subcontractors, including in its subcontract with TTU. *Id.* ¶ 30. TTU and NTESS have a Contract Purchase Agreement, or an "umbrella contract," pursuant to which the parties execute various task orders. *Id.* ¶ 33. TTU has a pending task order with

NTESS, and on November 9, 2021, NTESS requested a revision to the Contract Purchase Agreement that includes a COVID-19 safety clause. *Id.* ¶ 42.

Texas cannot demonstrate that the inclusion of this clause in the TTU contract (or any harm that Texas may speculate will result from its inclusion) was required by the EO itself or that a favorable decision in this Court would remedy that harm. NTESS voluntarily agreed to a clause permitting the NNSA to modify certain contract terms unilaterally. And as a subcontractor, TTU voluntarily agreed to a contract with NTESS that required it to comply with NTESS's various subcontractor obligations. This modification, therefore, results from "the independent action of some third party not before the court," *Allen v. Wright*, 468 U.S. 737, 757 (1984), namely, the decision by NTESS to accept a contract with NNSA that contains a unilateral modification provision. Although EO 14042 strongly encourages federal agencies to pursue such modifications to the extent permitted by law, it does not require them, and the lawfulness of such modifications will turn not on the EO, but on the specifics of the contract at issue.

To the extent that a government contractor wanted to seek relief against the United States for contract-based harm, Dkt. 6-1, Ex. G, ¶¶ 4-5 (referencing potential contract loss), any such action would have to be brought in the Court of Federal Claims.[15] Under the

---

[15] Although Texas's irreparable harm claim is premised in part on the declarations of other individuals who do not wish to be vaccinated for religious or medical reasons, *see* Dkt. 6-1, Exs. M-Q, Texas has provided no evidence that any of these individuals work for TTU or SNL-related work orders, let alone that they have sought a religious or medical exemption as EO 14042 authorizes them to do. Even had Texas done so, it would lack *parens patriae* standing to bring such claims. *See supra* at 10.

Contract Disputes Act, the Court of Federal Claims has exclusive jurisdiction over covered procurement claims sounding in breach of contract against the United States that exceed $10,000. *See* 28 U.S.C. § 1491(b); *accord* 28 U.S.C. § 1491(a) (COFC exclusive jurisdiction over non-procurement contract claims). *See also Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 941 (5th Cir. 1999) ("[T]he law of this circuit is clear that the Court of Claims has exclusive jurisdiction of a Tucker Act claim in excess of $10,000." (internal quotation marks and brackets omitted)); *Wilkerson v. United States*, 67 F.3d 112, 118 (5th Cir. 1995) ("We have consistently refused to allow district courts to adjudicate issues which belong solely to the Court of Claims, even though some other statute conferring jurisdiction would otherwise allow the district court to hear the case."). And the relief TTU potentially could obtain, assuming it had a viable contract claim and prevailed, would be monetary damages, thus precluding an assertion of irreparable harm. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").

Texas's attempt to rely upon future contracts fares no better. Those contracts—such as the putative USDA lease and NASA contract renewals—are either slated to take place so far in the future that they do not justify emergency relief now, or involve situations in which the contracts at issue are not yet up for renewal or extension. *See* Ex. A, Baughman Decl., ¶ 6; Ex. B, Liu Decl. ¶ 9; Ex. E, Jackson Decl. ¶ 7.

Texas also relies on the declarations of several individuals who work for federal contractors, and who object to the COVID-19 vaccine on religious grounds. *See* Dkt. 6-1, Exs. M–Q. As a threshold matter, Texas has no basis to assert any injury relating to these *parens*

*patriae*-type claims. *See supra* at 10. Whatever injuries Texas citizens may claim because they are employed by a contractor that profits from the Federal Government, the State of Texas is not in a position to bring suit on their behalf. Regardless, EO 14042 expressly authorizes covered contractors, in appropriate circumstances, to grant accommodations to employees "who communicate to the covered contractor that they are not vaccinated against COVID-19 because of a disability (which would include medical conditions) or because of a sincerely held religious belief, practice, or observance." 86 FR 63420. Only two of these individuals have provided any evidence about seeking an accommodation on the basis of their beliefs; and, of those two, they offer no evidence of what the result of that request was. Even if they had, and such request was denied, any denial of a requested accommodation would be attributable to their employer, not the United States—which has no role in the evaluation of any accommodation request. At any rate, because EO 14042 expressly authorizes federal contractors to grant the very relief that Texas seeks (*i.e.*, an accommodation of religious beliefs for "legally entitled" claimants), Texas cannot claim that any harm suffered will be attributable to EO 14042.

Moreover, Texas cannot claim it suffered any harm attributable to the FAR Memo. By itself, the FAR Memo caused Texas no harm and enjoining it would not redress any injury. The EO instructs agencies and contracting officers to include COVID-19 safety provisions in new contracts, contract renewals, and the like. EO § 2; *see* 41 U.S.C. § 1303(a)(2)(A) (agencies are authorized to implement regulations outside the FAR "to implement Government-wide policies"). The FAR Memo itself does not affect the authority of agencies to include COVID-

19 safety provisions in contracts, but merely suggests a sample COVID-19 safety clause that agencies and contracting officers can use. FAR Memo at 3.

Regarding all allegations of potential economic harm arising from amendments to existing contracts, as explained above, even the certainty of losing a contract would not be irreparable harm. Texas would have ample opportunity under the Contract Disputes Act to seek monetary redress. 28 U.S.C. § 1491(b)(1)–(2); *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) ("The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough.") (citation omitted). For these separate and independent reasons, Texas has failed to carry its burden to demonstrate irreparable harm. *Id.* at 240 ("The possibility [that] adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.") (citation omitted).

Finally, Texas's delay in seeking preliminary relief from this Court further confirms the absence of any irreparable injury. Texas waited seven weeks after the issuance of the EO and five weeks after the September Guidance's publication to file this suit, leaving only 26 days until the then-applicable vaccination deadline. Inexplicably, Texas then waited two more weeks before filing its motion for temporary restraining order and preliminary injunction, and proceeded to ask the Court to give Defendants only 48 hours for a response. *See* Tr. at 24–25. While Texas claims that it was "trying to figure out what was going to happen next," and it was "waiting to see exactly what the guidance was going to be, how it was going to be implemented," *id.* at 12, that does not explain the delay between the filing of the Complaint

43

and the motion for nationwide emergency and injunctive relief. The timing of Texas's motion is not consistent with the notion that it is in danger of being irreparably harmed. "The law is well-established that[] [d]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *GoNannies, Inc. v. GoAuPair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (internal quotation marks and citation omitted); *see also Texas v. United States*, 328 F. Supp. 3d 662, 738–39 (S.D. Tex. 2018) (collecting cases).

## C. The equities and the public interest weigh against injunctive relief.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, these considerations tilt decisively in Defendants' favor.

*First*, enjoining EO 14042 would harm the public interest by hampering the efficiency of the contractors on which the Federal Government relies. The COVID-19 pandemic has interfered with numerous aspects of the government's work, *e.g.*, by forcing office closures; interfering with employees' access to paper-based or sensitive records; limiting official travel; and causing staffing shortages. *See generally* Pandemic Response Accountability Committee, Top Challenges Facing Federal Agencies (June 2020), https://perma.cc/GGF4-F4FV. These disruptions have affected the work of federal employees and federal contractors alike. Requiring federal covered contractor employees to become fully vaccinated against COVID-19, with exceptions only as required by law, reduces disruptions caused by worker absences associated with illness or exposure to the virus, generating meaningful gains in contracting

efficiency. Enjoining EO 14042 would prevent these gains and would likely interfere with the government's ability to resume normal, pre-pandemic operations.

*Second*, enjoining EO 14042 would harm the public interest in slowing the spread of COVID-19 among millions of federal contractors and the members of the public with whom they interact. As the Supreme Court has recognized, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Accordingly, numerous courts reviewing "executive action designed to slow the spread of COVID-19" have concluded that "[t]he public interest in protecting human life—particularly in the face of a global and unpredictable pandemic—would not be served by" an injunction. *Tigges v. Northam*, 473 F. Supp. 3d 559, 573–74 (E.D. Va. 2020); *see also, e.g.*, *Am.'s Frontline Drs. v. Wilcox*, No. EDCV 21-1243, 2021 WL 4546923, at *8 (C.D. Cal. July 30, 2021); *Valdez v. Grisham*, ---F. Supp. 3d---, 2021 WL 4145746, at *13 (D.N.M. Sept. 13, 2021), *appeal filed*, No. 21-2105 (10th Cir. Sept. 15, 2021); *Harris v. Univ. of Mass., Lowell*, ---F. Supp. 3d---, 2021 WL 3848012, at *8 (D. Mass. Aug. 27, 2021), *appeal filed*, No. 21-1770 (1st Cir. Sept. 28, 2021); *Williams v. Brown*, ---F. Supp. 3d---, 2021 WL 4894264, at *10–11 (D. Or. Oct. 19, 2021); *Wise v. Inslee*, No. 2:21-cv-0288, 2021 WL 4951571, at *6 (E.D. Wash. Oct. 25, 2021); *Mass Corr. Officers Federated Union v. Baker*, ---F. Supp. 3d---, 2021 WL 4822154, at *7–8 (D. Mass. Oct. 15, 2021); *Johnson v. Brown*, ---F. Supp. 3d---, 2021 WL 4846060, at *26–27 (D.Or. Oct. 18, 2021); *TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 840–41 (W.D. Tenn. 2020); *Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 543 (E.D.N.C. 2020); *Brnovich v. Biden,* 2:21-cv-01568 (D. Az.) (denying preliminary injunction regarding Federal Government contractor vaccine

requirement).

*Third*, although Texas argues otherwise, the balance analysis here is not centered on the choice to vaccinate, Mot. at 30; rather, it is centered on the choice whether to contract with the Executive Branch. *See Perkins*, 310 U.S. at 127 ("Like private individuals and businesses, the Government enjoys the unrestricted power to produce its own supplies, to determine those with whom it will deal, and to fix the terms and conditions upon which it will make needed purchases.'"). Although Texas conflates the two issues, the balance must account for the Federal Government's right to engage freely as a commercial player. True, the terms on which the Executive Branch wishes to engage involve a vaccination component, but that is no different than the government setting other workplace safety conditions in its standardized-contact language. Vaccination is not being "imposed" or "coerce[d]" in any way here. Mot. at 30. While the decision to contract with the Executive Branch, or to remain employed with a covered contractor subject to the EO, may involve a complicated choice, that does not equate to an absence of choice. Mot. at 30. *Cf. Beckerich v. St. Elizabeth Med. Ctr.*, ---F. Supp. 3d---, 2021 WL 4398027, at *7 (E.D. Ky. Sept. 24, 2021) (noting, in an employee suit against an employer requiring vaccination, that "no Plaintiff in this case is being forcibly vaccinated."); *Smith v. Biden*, No. 1:21-cv-19457, 2021 WL 5195688, at *8 (D.N.J. Nov. 8, 2021), *appeal filed* (3d Cir. Nov. 10, 2021) (noting plaintiff employees are not subject to coercion and have a choice in the face of an employer-imposed vaccine requirement, partly as a result of EO 14042). Weighing the balance against Defendants here would fundamentally challenge the Executive Branch's rights to engage freely as a player in the commercial marketplace, contrary

to long-standing precedent.

While it is not for Texas to pass judgment on the wisdom of Federal Government-contracting policy, it is worth noting that the contracts in issue here show that the Government has proceeded judiciously, and has tailored its approach to the particular equities implicated in each contractual arrangement. For the vast majority of contracts on which Texas relies, the United States has either not asked to modify the contracts at all or has withdrawn such request, *see, e.g.*, Ex. A, Baughman Decl. ¶ 9; Ex. F, Lopez Decl. ¶ 9, or has or has asked Texas to agree to modify such requests bilaterally, *see, e.g.*, Ex. C, Summers Decl. ¶¶ 17–18; Ex. E, Jackson Decl. ¶¶ 5–7, Ex. B, Liu Decl. ¶ 14. At the same time, where the inclusion of a COVID-19 safety clause is important to ensuring operational continuity of entities integral to our nation's security and counterterrorism efforts—as Sandia is—the United States has appropriately invoked contractual authority pre-dating EO 14042 to make the necessary changes. *See* Ex. D, Westlake Decl. ¶ 18 ("Because any disruption to NTESS's mission effectiveness could prove catastrophic to the national security of the United States, NTESS has taken significant measures to ensure its efficient and effective functioning.  This includes, but is not limited to, operational disruption caused by the COVID-19 health pandemic.").

*Finally*, granting the requested injunction against Defendants would not preserve the relative positions of the parties since entering the requested relief would upend the status quo by (1) preventing further implementation of EO 14042, which has been in effect for over two months; and (2) interfering with the Federal Government's ability to determine the terms on which it will enter into contracts. *See, e.g.*, *Nken*, 556 U.S. at 428–29 (explaining that enjoining

47

a government policy is an act of "judicial intervention" that "*alter[s]* the legal status quo"). Further, granting the relief sought against Defendants would generate the absurd result of allowing challengers to obtain a preliminary injunction against *any* new government policy, in order to maintain the prior "status quo" until a decision on the merits. *But see Winter*, 555 U.S. at 24 ("A preliminary injunction is an extraordinary remedy never awarded as of right."); *Brown v. Gilmore*, 533 U.S. 1301, 1303 (2001) (Rehnquist, C.J., in chambers) (explaining that "an injunction against the enforcement of a presumptively valid" enactment should only be granted in extraordinary circumstances).

Against these weighty and substantial federal interests, Texas has presented what is largely a mirage of impending economic calamity. While Texas would have this Court believe that EO 14042 portends a summary, across-the-board invalidation of numerous federal contracts worth tens of millions of dollars, the reality bears no resemblance to Texas's characterization. As noted, Texas has identified no current contract that Defendants improperly modified. While Texas unquestionably disagrees with the policy determinations that undergird EO 14042, the harm to Defendants from allowing Texas (or any state) to dictate federal contract policy far outstrips any harm to Texas from allowing the United States to supervise and direct the terms on which it will enter into contracts.

In sum, granting the pending motion would harm the public interest far more than denying the motion would harm Texas, and the motion should therefore be denied.

### III. In all events, this Court should not enter relief extending beyond federal contracts with the State of Texas.

Although preliminary relief is unjustified here, at a minimum, any such relief should be

no broader than necessary to redress Texas's alleged injuries. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018) (citation omitted). Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). *See also, e.g.*, *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) ("Allowing one circuit's statutory interpretation to foreclose . . . review of the question in another circuit" would "squelch the circuit disagreements that can lead to Supreme Court review."). Consistent with those equitable principles, the Fifth Circuit has repeatedly vacated or stayed universal injunctions that apply to nonparties. *See, e.g.*, *Texas v. United States*, 14 F.4th 332, 341 (5th Cir. 2021); *Marshall v. Goodyear Tire & Rubber Co.*, 554 F.2d 730, 735 (5th Cir. 1977).

EO 14042 and its implementing guidance have been challenged in numerous other cases, underscoring why this Court should not attempt to decide its legality for all parties. *See, e.g.*, *Smith*, 2021 WL 5195688 (denying preliminary injunction regarding EO 14042); *Brnovich v. Biden*, 2:21-cv-01568 (D. Az.) (same); *Georgia v. Biden*, 1:21-cv-163 (S.D. Ga.) (preliminary injunction request pending); *Missouri v. Biden*, 4:21-cv-1300 (E.D. Mo.) (same); *Oklahoma v. Biden*, 5:21-cv-01069 (W.D. Okla.) (same); *Louisiana v. Biden*, 1:21-cv-3867 (W.D. La.) (same); *Kentucky v. Biden*, 3:21-cv-00055-GFVT (E.D. Ky.) (same); *Hollis v. Biden*, 1:21-cv-163 (N.D.

Miss.) (same); *Navy Seal 1 v. Biden*, No. 8:21-cv-02429 (M.D. Fla.).

At a minimum, Texas is not entitled to any broader injunction unless it can show "a substantial likelihood that a geographically-limited injunction would be ineffective." *Texas*, 809 F.3d at 188. Texas does not even attempt to meet that standard. Further, even assuming that Texas identified a contract sufficient to confer standing to challenge (and this Court jurisdiction to consider) the EO, any relief should be tailored to that specific contract. Any such relief should merely block enforcement—not inclusion—of the COVID-19 safety clause. Allowing COVID-19 safety clauses to be included but not enforced during the pendency of this litigation would mean that contractors within the EO's scope would not have to require their employees to be vaccinated. But if EO 14042 and its implementing guidance are ultimately upheld, the policy can be put into effect without further delay.

## CONCLUSION

For the foregoing reasons, this Court should deny Texas's Motion for a Preliminary Injunction.

DATED: November 22, 2021   Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRAD P. ROSENBERG
Assistant Branch Director

*/s/ Kristin A. Taylor*

KRISTIN A. TAYLOR (TX Bar. 24046952)
C. Lee Reeves III
Madeline M. McMahon
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
(202) 353-0533 (direct)
(202) 616-8470
kristin.a.taylor@usdoj.gov

JENNIFER B. LOWERY
Acting United States Attorney

Daniel David Hu
Chief, Civil Division
Assistant U.S. Attorney
S.D. Id. 7959
Texas Bar Number 10131415
1000 Louisiana, Suite 2300
Houston, TX 77002
713 567 9518
Daniel.hu@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 22, 2021, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a notification

to counsel of record.

*/s/ Kristin A. Taylor*
Kristin A. Taylor
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
(202) 353-0533 (direct)
(202) 616-8470
kristin.a.taylor@usdoj.gov