UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS,<br>    *Plaintiff*,<br><br>v.<br><br>JOSEPH R. BIDEN, in his official capacity as President of the United States, et al.,<br>    *Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO. 3:21-CV-309 |

# THE STATE OF TEXAS'S REPLY IN SUPPORT
# OF MOTION FOR PRELIMINARY INJUNCTION

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief, General Litigation Division

**CHRISTOPER D. HILTON**
Deputy Chief, General Litigation Division
Texas State Bar No. 24087727
So. Dist. No. 3029796
Christopher.Hilton@oag.texas.gov

**AMY SNOW HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
So. Dist. No. 3350717
Amy.Hilton@oag.texas.gov

**HALIE ELIZABETH DANIELS**
Assistant Attorney General
Texas State Bar No. 24100169
So. Dist. No. 3380631
Halie.Daniels@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 / Fax (512) 320-0667

**COUNSEL FOR THE STATE OF TEXAS**

Defendants' actions were *ultra vires*, arbitrary and capricious, and procedurally improper. The Court should enjoin the implementation and enforcement of the Contractor Mandate to protect Texas from Defendants' regulatory quagmire. Defendants try to avoid the numerous failings of the Contractor Mandate—any one of which would suffice to set it aside—by claiming that this Court is powerless to even review their decisions. But these arguments fail. The Court should prevent the ongoing injury to the State of Texas and enjoin Defendants' unlawful conduct.

## ARGUMENTS & AUTHORITIES

**A.     Texas has standing.**

Defendants' attack on the State's standing is meritless and should be rejected, and the State has been and is being directly, irreparably injured in a number of ways.[1] First, the State is suffering direct economic and financial harm. Federal agencies are using the Contractor Mandate to seek amendments to contracts—even when those contracts fall below the Simplified Acquisition Threshold—and Defendants make no representation that they will not terminate contracts with Texas entities. *See* Dkt. #6-1 at 60; *see also* Dkt. #34-1, 34-4 at ¶41, 34-5. Simply put, billions of dollars are at stake, which Defendants do not refute. *See* Dkt #6-1 at 76–97. Accordingly, Texas has "alleged a concrete threatened injury in the form of millions of dollars of losses," *Texas v. United States*, 809 F.3d at 186 (5th Cir. 2015), which gives it standing. *See, e.g.*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018)

---

[1] For this reason, the State does not rely only on a *parens patriae* theory of standing, as Defendants suggest. Rather, the State has standing in its own right.

*Reply in Support of Motion for Preliminary Injunction*                                                                                                              1

(holding that a likely loss of funds promised under federal law is sufficient to demonstrate standing).

Second, the State will also suffer indirect financial harms due to Defendants' unlawful Contractor Mandate. While the precise cost is unknowable, Defendants cannot and do not seriously dispute that Texas will spend *some* amount of money in public assistance for Texans who are forced to leave their jobs rather than receive a medical treatment to which they are opposed. *See, e.g.*, Dkt. #6-1 at 99–101, 104–106, 114–120. This is a "predictable effect of Government action on the decisions" made by Defendants. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). Indeed, Defendants themselves have acknowledged that workers may leave or be fired. *See* Dkt. #34 at 27–28. "The causal chain is easy to see[.]" *State v. Biden*, 10 F.4th 538, 548 (5th Cir. 2021). Accordingly, the State may seek redress of this inevitable harm.

Third, Defendants are inflicting irreparable, non-economic injuries on the State's sovereign interests. The Contractor Mandate constitutes an injury to the State because it prevents the State from enforcing its own laws. Every day the Contractor Mandate remains in effect, antagonistic of GA-40,[2] Plaintiff suffers an irreparable injury. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *Maryland v. King*, 567 U.S. 1301, 1303 (2012); *Org for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020); *Coal. For Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997). The Fifth Circuit has made clear that when a state is blocked from implementing its own laws, "the State necessarily suffers the irreparable harm of denying the

---

[2] GA-40 makes it illegal for any entity in Texas to compel receipt of a COVID-19 vaccine by any individual, including an employee or consumer, who objects to such vaccination "for any reason of personal conscience, based on a religious belief, or for medical reasons, including prior recovery from COVID-19. GA-40 is available at https://lrl.texas.gov/scanned/govdocs/Greg_Abbott/2021/GA-40.pdf (last visited Nov. 29, 2021).

*Reply in Support of Motion for Preliminary Injunction* 2

public interest in the enforcement of its law." *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). Similarly, the Contractor Mandate injures the Plaintiff's sovereign interest in exercising its own police power in an area where the traditional authority of the State is paramount and the federal Government possesses no enumerated power. *See, e.g., BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, No. 21-60845, 2021 WL 5279381, at *7 (5th Cir. Nov. 12, 2021) (holding that mandating "a person receive a vaccine or undergo testing falls squarely within the States' police power" and States are irreparably harmed by federal overreach into their "constitutionally reserved police power over public health").

Moreover, the State's ample showing of its standing should not be lightly cast aside as a result of Defendants' few pages of briefing on the issue. It is of "considerable relevance that the party seeking review here is a sovereign State and not . . . a private individual," because Texas is not a "normal litigant[] for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518, 526 (2007). States should be given "special solicitude" in the standing analysis where, as here, the state seeks to obtain judicial recourse for illegal agency action under the APA and where the state's sovereign interests are at stake. *Id.* at 520.

Defendants' assertion that "Texas [has not] presented evidence that it will be denied a new contract . . . absent to its assent to the inclusion of the COVID-19 safety clause" is meritless. Dkt. #34 at 12. The face of the Task Force Directive itself requires that: (1) on existing contracts "the requirements *must be* incorporated" at the point in which an option or extension is exercised and (2) on new contracts "the requirements *must be* incorporated" on or after November 14, 2021. Dkt. #1-2 at 18. It therefore follows that without the inclusion of

the Task Force Directive, no new contracts will be awarded to the State of Texas or its agencies. And Defendants do not give Texas a safe harbor from these requirements.

For the foregoing reasons, the State has standing to bring this litigation.

**B.      Texas will likely succeed on the merits of its claims.**

In their Response, Defendants use the President's authority under the Procurement Act and his Executive Order as a shield to attempt to insulate themselves from judicial scrutiny. *See, e.g.*, Dkt. #34 at 32. Assuming *arguendo* Defendants' theory is accurate, Texas is entitled to injunctive relief upon a showing that the President acted *ultra vires* in issuing the Executive Order. Because the President *has* exceeded his authority in issuing the Executive Order, and Defendants acknowledge that Texas properly brings an *ultra vires* claim to challenge the President's action, *see* Dkt. #34 at 24, the Court should issue an order enjoining the implementation and enforcement of the Contractor Mandate.

> 1. **The President acted *ultra vires* when he promulgated the Executive Order, because there is no nexus between the purpose of the Procurement Act and the Contractor Mandate.**

Defendants' conclusory assertion that vaccination "promotes efficiency and economy" by "[e]nsuring . . . contractors do not suffer major disruptions from COVID-19" wholly ignores the significant disruptions to federal contracting that will result from the Contractor Mandate. *Compare* Dkt. #34 at 14*, with* Dkt. #6-1. And while Defendants rely on the explanations set out for the first time in the November OMB Rule to attempt to demonstrate a nexus between the Executive Order and the requirements of the Procurement Act, *see, e.g.,* Dkt. #34 at 14, 15, 17, for the reasons stated below, *see* § B(5) *infra*, the November OMB Rule's

explanations are not entitled to any deference because they are manufactured *post hoc* rationalizations issued in response to mounting litigation brought by the States.

Nevertheless, no explanation or analysis could bring the President's Executive Order within the purposes of the Procurement Act. Defendants rely heavily on, *UAW-Labor Employment and Training Corp. v. Chao*, and for their wide-ranging view of the President's authority under the Procurement Act, but their reliance is misplaced. The three cases on which Defendants rely most heavily do not alter this conclusion. First, Defendants ignore the D.C. Circuit's emphasis in *AFL-CIO v. Kahn* that its holding did not "write a blank check for the President to fill in at his will." 618 F.2d 784, 793 (D.C. Cir. 1979). In *Kahn*, Court emphasized that "[t]he procurement power must be exercised consistently with the structure and purposes of the statute that delegates that power." *Id.* Second, whether the President exceeded his authority under the Procurement Act was not an issue before the Court in *Farkas v. Texas Instrument, Inc. See* 375 F.2d 629, 631, 632 n. 1 (5th Cir. 1967). Third, Defendants' reliance on *UAW-Labor Employment and Training Corp. v. Chao* is wholly inapposite—that case considered whether the President had the authority to require contractors to *post notices* informing employees of their rights, not whether the President could *compel vaccination* of millions of Americans. *See* 325 F.3d 360 (D.C. Cir. 2003).

Defendants' response lays bare how little they regard the rights of Americans to decline a COVID vaccine. In *Kahn*, the Court held that Congress' delegation of authority to the President demonstrates Congress wanted the President "play a direct and active part in supervising the Government's *management functions*." *Id.* at 788 (emphasis added). In analogizing the Contractor Mandate to *Kahn*, *Farkas*, and *Chao*, Defendants ignore the considerable

difference between workplace wage-setting, anti-discrimination policies, requirements to notify employees of their rights and mandatory vaccination.[3] Mandatory vaccination can hardly be said to be a central tenet of business management. *See* Dkt. #34 at 13, 16. Indeed, if the Fifth Circuit does not believe the Occupational Safety and Health Act authorizes OSHA to require vaccination for workplace *safety*, it is hard to imagine that the Contractor Mandate falls within the ambit of the Procurement Act and the President's supervision over workplace management. *See BST Holdings*, 2021 WL 5279381, at *8.

Moreover, Defendants' proposed interpretation of the "nexus" requirement would render the President's power under the Procurement Act virtually unrestricted. Defendants offer no limiting principle to the President's authority except to gesture vaguely to a prohibition against "arbitrary decrees." *Compare* 40 U.S.C. § 121(a), *with* Dkt. #34 at 15–18. But it is difficult to see what decrees Defendants would actually consider arbitrary. Under their interpretation, the President's authority to prescribe certain "policies and directives" within the scope of the Act is unlimited as long as he considers "the policy 'necessary.'" Dkt. #34 at 16. The limitless scope of Defendants' interpretation of the President's authority "would counsel against the Government's interpretation." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021); *see also BST Holdings*, 2021 WL 5279381, at *8 (holding that even if the Occupational Safety and Health Act could be construed to authorize

---

[3] Defendants' citations to *AFGE v. Carmen*, 669 F.2d 815 (D.C. Cir. 1981), and *Chamber of Commerce v. Napolitano*, 648 F. Supp. 2d 726 (D. Md. 2009), are similarly inapposite—whether the President has authority to phase out free parking or require federal contractors to comply with federal immigration law is decidedly different from mandating vaccines.

*Reply in Support of Motion for Preliminary Injunction* 6

a vaccine mandate "under the guise of a workplace regulation," "serious constitutional concerns would counsel this court's rejection of that reading").

### 2. The President acted *ultra vires* by requiring the FAR Council to amend the FAR.

The operative facts regarding the President's usurpation of the FAR Council's authority are uncontested. Defendants do not dispute that the Procurement Policy Act only authorizes the FAR Council to issue, maintain, and amend the FAR. Dkt. #34 at 20 n. 11. But the President, through his Executive Order, demands the FAR Council "amend the [FAR]" to include a clause requiring contractors and subcontractors to comply with the Task Force Directive. Exec. Order 14042, 86 Fed. Reg. at 50,986. Defendants offer no support for the assertion that the President is authorized to assume the role of the FAR in this way. Instead, Defendants contend, incredibly, that the President has not usurped the authority of the FAR Council because he only *directed* the FAR Council to amend the FAR and did not actually "prescrib[e] the amendments himself." Dkt. #34 at 20. Defendants' position strains credulity. The President exceeded his authority under the Procurement Act, and for this reason alone, the Contractor Mandate should be set aside.

### 3. The FAR Council Directive and Deviation Clause, OMB Rule, and Task Force Directive are subject to the procedural requirements under the Procurement Policy Act.

Defendants' arguments excusing the Contractor Mandate from the requirements of the Procurement Policy Act fail for multiple reasons.

#### a. *OMB Rule.*

Defendants contend that because the OMB Director "acted pursuant to a delegation from the President," the OMB Rule is exempted from the requirements of section 1707. Dkt.

#34 at 30. That is not the law. Courts are not without power to review the actions of federal officials and agencies merely because the actions were taken in accordance with executive orders. *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). In *Gomez v. Trump*, the defendants offered the same arguments Defendants offer here—namely, that when the president relies on agencies to carry out his executive order, agency implementation of the executive order is shielded from judicial review. 485 F. Supp. 3d 145, 177 (D.C. Cir. 2020). The court rejected that argument, holding that defendants "suffer[ed] from a fundamental . . . misreading of the law." *Id.* at 177. Even when agencies and federal officials act "at the behest of the President" through an executive order, "courts have power to compel [them] to disobey illegal Presidential commands." *Reich*, 74 F.3d at 1328.

Moreover, the Court should readily dispose of Defendants' contention that the November OMB Rule is not subject to notice and comment because the Rule invoked section 1707(d)'s waiver for "urgent and compelling circumstances." *See* Dkt. #34 at 30–31. Defendants' new position that "urgent and compelling circumstances . . . justify departing from the notice-and-comment" requirements is belied by the fact that Defendants did not claim these emergency circumstances existed when they promulgated the September OMB Rule, which is substantively the same as the November OMB Rule. *See* Dkt. #1-2 at 22–23. Defendants have not identified a change in circumstances supporting the new invocation of subsection (d). *See* 86 Fed. Reg. at 63,423 (Dkt. #11-1). The purported emergency is plainly pretextual since Defendants only invoked it after this lawsuit (and others) challenged Defendants' failure to post the OMB Rule for notice and comment. *See* Dkt. #11-1; *see also, e.g., State of Florida v. Bill Nelson*, Civ. A. No. 8:21-cv-2524, 2021 WL 5025463 (M.D. Fla.).

Finally, Defendants cannot credibly claim "urgent and compelling circumstances" justify this procedural violation while simultaneously delaying the implementation of the Contractor Mandate. *See id.*

"[C]ourts will ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Reich*, 74 F.3d at 1328 (cleaned up). Here, Defendants failed to conduct notice and comment as required by the Procurement Policy Act, and the Court should grant relief to remedy this violation.

        b.     *FAR and Task Force Directives*.

Agency action that has the force and effect of law is subject to the requisite procedural requirements of the statute that authorizes such action. *See Texas v. EEOC*, 933 F.3d 433, 441–42 (5th Cir. 2019) (explaining that agency action treated as binding is reviewable as final agency action). The FAR Council Directive authorizes and directs agencies' compliance with the Executive Order. Together, the FAR Council and Task Force Directives are being used by agencies to seek amendments to contracts. *See, e.g.*, Dkt. #61-1 at 66; Dkt. #34-4; Dkt. #34-5. The FAR Council Directive gives pre-approval to the Deviation Clause and imposes the Task Force Directive's requirements, including the information contained in the Task Force Directive's Frequently Asked Questions.[4] Defendants were required to go through notice and comment procedure, and they failed to do so.

---

[4] *See* Exhibit F in Dkt. #6-1, Memorandum from FAR Council to Chief Acquisition Officers et al. re: Issuance of Agency Deviations to Implement Executive Order 14042 (Sept. 30, 2021).

*Reply in Support of Motion for Preliminary Injunction*                                                   9

4.     **The FAR Council Directive is subject to review under the APA.**

In their Response, Defendants contend that the Court need not consider whether the FAR Council Directive is arbitrary and capricious, because it does not amount to "final agency action" subject to judicial review under the APA. This argument fails.

There is a strong presumption in favor of judicial review of administrative action. *Texas v. United States*, 809 F.3d 134, 163 (5th Cir. 2015). The Supreme Court has held that agency actions are "final" and reviewable under 5 U.S.C. § 704 where (1) they mark the "consummation" of the agency's decision-making progress and (2) "legal consequences will flow" from what the agency did. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). "'[W]here agency action withdraws an entity's previously-held discretion, that action alters the legal regime, binds the entity, and thus qualifies as final agency action' under the APA." *Texas*, 10 F.4th at 550 (quoting *Texas v. EEOC*, 933 F.3d at 442). The FAR Council Directive satisfies both prongs of this test.

"[E]ven an interim agency resolution counts as final agency action despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency." *Id.* at 78. The Fifth Circuit considers whether agency action is "final" "[u]nder a flexible, pragmatic reading." *Quereshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011). The FAR Council Directive constitutes final agency action, because it does not "genuinely [leave] [an] agency and its decisionmakers free to exercise discretion." *Ctr. for Auto Safety & Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 806 (D.C. Cir. 2006). Defendants' Response demonstrates that the FAR Council Directive was issued with general applicability and obligatory effect: "[T]he FAR Council issued [the FAR Directive and

Deviation Clause] to *ensure consistency across federal contracting at large . . .* until the FAR is amended." Dkt. #34 at 21 (emphasis added). And while Defendants claim contractors could make some minor changes to the wording of the Deviation Clause, the substance must be the same. *See* Dkt. #34 at 32 ("contractors need not adopt this *precise language*") (emphasis added). The FAR Directive is being used by agencies to implement amendments to contracts to ensure compliance with the Executive Order, *see, e.g.,* Dkt. #6-1 at 55, 64, 66, and Defendants' evidence shows as much. *See* Dkt. #34-4; Dkt. #34-5.

Defendants try to avoid judicial review of the FAR Directive by contending that the FAR Directive is not the "conclusion of the policymaking process." Dkt. #34 at 25. But if agencies could avoid judicial review by cloaking their actions as "non-final" or "interim," they could avoid judicial review of their actions for an indefinite amount of time. *See Wheeler*, 955 F.3d at 79 (citing *Exhaustless v. FAA*, 931 F.3d 1209 (D.C. Cir. 2019), in which the FAA promulgated "interim" regulations that remained in effect for over a decade). The FAR Council Directive represents the FAR Council's final position on this issue. *See Wheeler*, 955 F.3d at 79-80 (holding that when an agency's decision "represents the final agency *position on this issue*," it is a "final agency decision" for purposes of judicial review under the APA). Defendants admit the FAR Council is continuing to take steps to implement the contract clause in the FAR, and they do not identify any anticipated differences between the Directive in effect now and what they anticipate the "final agency action" to look like. Dkt. #34 at 25. The FAR Council Directive is "far removed from the types of agency action—such as informal letters issued by subordinate officials—that we have held do not amount to the culmination of an agency's decisionmaking process." *Wheeler*, 955 F.3d at 78.

*Reply in Support of Motion for Preliminary Injunction* 11

As to the second prong, it is circular to claim, as Defendants do, that the FAR Council Directive is not "a decision from which 'legal consequences will flow,'" Dkt. #34 at 25, because it "was issued in accordance with the EO's instructions" and "legal consequences . . . emanate from the EO," Dkt. #34 at 25–26, but also to admit that "EO 14042 is not self-executing." Dkt. #34 at 37. Defendants cannot have it both ways. The President has violated statutory commands from Congress and promulgated an unlawful executive order that requires federal officials and agencies to take action to implement it. Exec. Order 14042, 86 Fed. Reg. at 50,986. The FAR Council cannot credibly claim that the unlawful command it is obeying somehow shelters its unlawful conduct from judicial review.

**5. The OMB Rule and FAR Directive and Deviation Clause are arbitrary and capricious.**

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021), which implies a host of procedural obligations. An agency must consider the reliance interests of those affected by the regulation, *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913–15 (2020), and must consider less-disruptive policies in the light of those interests. *Id.* An agency must defend its actions based on the reasons it gave when it acted." *Regents*, 140 S. Ct. at 1909. In reviewing agency decisions, courts "can consider only the reasoning 'articulated by the agency itself'; [courts] cannot consider *post hoc* rationalizations." *State v. Biden*, 10 F.4th at 552 (quoting *State Farm*, 463 U.S. at 50).

Both the OMB Rule and the Far Directive reached arbitrary conclusions, failed to consider the States' reliance interests, failed to consider alternatives, and failed to consider the effect of the Contractor Mandate on Texas' compliance with State law. Defendants'

contention that the November OMB Rule constitutes "[a]n entirely new agency action" does not hold water. The November OMB Rule simply recasts the conclusion of the September OMB Rule and equally fails to consider obvious factors like (1) the differences in risks between federal contractors who work from home and those who don't, (2) the effect of natural immunity, (3) contractors' ability to comply with GA-40, and (4) the costs of unemployment to the States. Even after a second bite at the apple, Defendants failed to cure the fatal defects of the OMB Rule.

### 6. Defendants do not effectively dispute that the Contractor Mandate violates the nondelegation doctrine.

Whatever the bounds of the President's authority may be under the Procurement Act, it is undisputed that the President is only authorized to delegate this authority to officials confirmed by the Senate, and the Task Force includes members who are not confirmed by the Senate. *See* 3 U.S.C. § 301; Dkt. #34 at 33. Defendants' strained attempt to draw a distinction between the President "directing" and "delegating" falls flat. *See* Dkt. #34 at 33. Because the Task Force includes members not confirmed by the Senate, this delegation is unlawful.

### 7. The Contractor Mandate violates the Spending Clause.

Defendants cite no authority for the assertion that Congress authorized the President, through the Procurement Act, to condition the receipt of federal funds on requiring medical treatment. Moreover, the cases cited by Defendants support the proposition that only *Congress* can condition the receipt of federal funds. *See Com of Ky. Dep't of Human Res. v. Donovan*, 704 F.2d 288, 298–99 (6th Cir. 1983) (citing *Pennhurst State Hosp. v. Halderman* and holding that states can choose to accept "conditions imposed by *Congress*" (emphasis added)); *see also Nat'l*

*Endowment for the Arts v. Finely*, 524 U.S. 569 (1998) (considering criteria imposed by Congress on the National Endowment for the Arts' selection of grant applications).

Defendants cite *Donovan* in support of their assertion that contractors can be required to comply with "periodically updated guidelines." Dkt. #34 at 35. But in *Donovan*, the Act at issue required the State to comply with the Act and its amendments—in other words, *legislative* amendments. 704 F.2d at 299. Legislative amendments like those referenced in *Donovan* contemplate an orderly process that interested parties can track—not open-ended amendments to Frequently Asked Questions on websites that may be changed at any time—and which have already been modified since the inception of this lawsuit.

C. **Texas is irreparably harmed by the Contractor Mandate.**

As discussed *supra*, the State of Texas is irreparably harmed every day the Contractor Mandate remains in effect. Defendants' exhibits further prove Plaintiff is *likely* to suffer additional economic harm if the Contractor Mandate is not enjoined. Defendants boldly, and incorrectly, assert that "nothing in EO 14042 purports to "prevent [Texas] from enforcing its laws." Dkt. #34 at 36. But EO 14042 stands in direct contradiction to GA-40, constituting an irreparable harm to Texas. *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. at 2324 n.17; *Maryland v. King*, 567 U.S. at 1303; *Ashcroft*, 978 F.3d at 609; *Wilson*, 122 F.3d at 719.

Moreover, the Tucker Act does not deprive this Court of jurisdiction, nor does it provide an adequate remedy to Texas's harm, because this is not a suit *on* government contracts—this is a suit to enforce statutory and constitutional rights and limitations. *See North Side Lumber Co. v. Block*, 753 F.2d 1482, 1485 (9th Cir. 1985). It has long been held that the Tucker Act applies only to actions for money damages—not for suits for equitable relief. *See*

*United States v. Jones*, 131 U.S. 1 (1889); *see also Lee v. Thornton*, 420 U.S. 139, 140 (1975); *South Delta Water Agency v. Bureau of Reclamation*, 767 F.2d 531, 540 (9th Cir. 1985).

### D. The balance of the equities and public interest weigh in favor of injunctive relief.

While Defendants claim that an injunction would obstruct their ability to "determine the terms on which [the Federal Government] will enter into contracts," this purported harm is vague and outweighed by the constitutional and statutory violations Texas alleges and the serious economic threat. *See United States v. Texas*, 809 F.3d at 186. There is a public interest in having federal agencies and officials abide by federal law. And while Defendants' motives may be to reduce the spread of COVID-19, "our system does not permit agencies [or the President] to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors*, 141 S. Ct. at 2490.

The Contractor Mandate is the fruit of *ultra vires* actions and violations of the Procurement Policy Act, the APA, and the Constitution. Moreover, the effect of these violations is not limited to Texas, and neither should this Court's injunctive relief. Courts "should not be loathe to issue injunctions of general applicability." *Hodgson v. First Federal Sav. & Loan Ass'n of Broward Cnty., Fla.*, 455 F.2d 818, 826 (5th Cir. 1972). "The injunctive processes are a means of effecting general compliance with national policy as expressed by Congress, a public policy judges too must carry out." *Id.* at 826. For these reasons, the State of Texas respectfully requests the Court issue an order declaring the Contractor Mandate void and unenforceable. *See* Dkt. #6-2.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN COWLES**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief, General Litigation Division

*/s/ Christopher D. Hilton*
**CHRISTOPHER D. HILTON**
Deputy Chief, General Litigation Division
Texas State Bar No. 24087727
So. Dist. No. 3029796
Christopher.Hilton@oag.texas.gov

**HALIE ELIZABETH DANIELS**
Assistant Attorney General
Texas State Bar No. 24100169
So. Dist. No.  3380631
Halie.Daniels@oag.texas.gov

**AMY SNOW HILTON**
Assistant Attorney General
Texas State Bar No. 24097834
So. Dist. No. 3350717
Amy.Hilton@oag.texas.gov

Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548

**COUNSEL FOR THE STATE OF TEXAS**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document and all attachments were filed via CM/ECF, causing electronic service on all counsel of record.

*/s/ Christopher D. Hilton*
**CHRISTOPHER D. HILTON**
